# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Meredith Huffman, Respondent,

v.

Sunshine Recycling, LLC and Aiken Electric
Cooperative, Inc., Petitioners.

Appellate Case No. 2016-002080

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Orangeburg County
Maité Murphy, Circuit Court Judge

---

Opinion No. 27874
Heard March 6, 2018 – Filed March 27, 2019

---

## AFFIRMED IN PART AND REVERSED IN PART

---

Breon C. M. Walker and Jessica Ann Waller, both of
Gallivan, White & Boyd, PA; and Pope D. Johnson III, all
of Columbia, for Petitioners.

James Todd Rutherford, of The Rutherford Law Firm,
LLC; and Robert Fredrick Goings and Jessica Lee
Gooding, both of Goings Law Firm, LLC, all of Columbia,
for Respondent.

---

**CHIEF JUSTICE BEATTY:** Following her arrest for receiving stolen goods, Meredith Huffman filed a complaint against the Orangeburg County Sheriff's Department (the Sheriff's Department), Sunshine Recycling, LLC (Sunshine), and Aiken Electric Cooperative, Inc. (Aiken), for negligence, false imprisonment, and malicious prosecution. Huffman later settled her claims against the Sheriff's Department, and the two parties filed a stipulation dismissing the Sheriff's Department from the action.[1] The trial court granted summary judgment in favor of Sunshine and Aiken. The court of appeals reversed. *Huffman v. Sunshine Recycling, LLC*, 417 S.C. 514, 790 S.E.2d 401 (Ct. App. 2016). Both Sunshine and Aiken filed petitions for writs of certiorari to review the court of appeals' opinion. We granted the petitions, and now reverse the court of appeals' opinion as to Sunshine and affirm as to Aiken.

## I.     Factual and Procedural History

On May 16, 2010, seventy pounds of copper wire and fifty pounds of aluminum tie wire were stolen from Aiken. In total, the stolen wire was worth $463.19.

The following day, Mark Goss, Aiken's Loss Control and Safety Coordinator, and Deputy Maurice Huggins viewed a surveillance video from Aiken that depicted an unidentified black male removing copper and aluminum wiring from Aiken trucks. An Aiken employee also reported seeing a white Ford truck driving out of Aiken's parking lot around the time of the theft. As was Goss's typical practice when Aiken suffered a loss of this nature, Goss checked with local metal recyclers to see if the thief tried to sell the copper and aluminum.

Goss's search led him to Sunshine. Goss testified he arrived at Sunshine the morning following the theft and only two customers had come in. Goss told Sunshine's owner, Joseph Rich, he was looking for stolen copper and aluminum wire believed to have been taken by a black male in a white Ford pickup truck. Rich took Goss into the metal drop-off area to look for the stolen items. Goss identified Aiken's materials which were comingled with other metals. Rich, who claimed to speak Spanish, spoke to an unidentified Spanish-speaking employee working in the metal

---

[1] Based on this dismissal, only the false imprisonment and malicious prosecution causes of action remained as to Aiken and Sunshine.

drop-off area. According to Goss, the Spanish-speaking employee informed Rich a white woman had brought the copper and aluminum wire to Sunshine.[2] However, Rich later testified in his deposition the Spanish-speaking employee informed him "that the *first person* in the warehouse that was selling materials in that group was a white woman." (emphasis added.) There is no indication Rich asked the employee about any subsequent customers.

Officer Ashley Aldridge of the Sheriff's Department arrived at Sunshine to investigate the theft. Goss informed Aldridge he believed a black male in a white Ford truck was involved and told Aldridge what Aiken's surveillance video showed, that an Aiken employee saw a white truck leaving Aiken at the time of the robbery, and what the Spanish-speaking employee at Sunshine reported. Rich told Aldridge and Goss they were welcome to view the receipts documenting the amounts paid to customers who sold metal to Sunshine that morning and the time-stamped video footage of customers waiting at the payment window. Aldridge viewed the video, saw Huffman waiting for her payment of $53, and obtained a copy of Huffman's receipt. Rich also informed Aldridge that Sunshine had a video of the metal drop-off area and, although there were issues with the video playback that morning, he would provide Goss and the Sheriff's Department with a copy.

The next day, May 18, 2010, Officer James Ethridge visited Sunshine to photograph the metal identified by Goss as stolen from Aiken. Ethridge testified that when he arrived at Sunshine, Sunshine employees had already pulled copies of Huffman's invoice, receipt, and driver's license. While at Sunshine, Ethridge spoke with Rich, who reiterated the employees working in the drop-off area had informed him Huffman was the individual who brought in the items and she was driving a red truck. Rich also stated he had not yet obtained a copy of the video showing the metal drop-off area but would contact Sunshine's security servicer to request a copy of the video for Ethridge.

Officer Ethridge's report regarding the incident stated Goss contacted Ethridge and claimed he (Goss) had spoken with Huffman at Sunshine on May 17, 2010, while she was waiting to get paid for "the items that she had just brought in." According to the report, Goss also told Ethridge, "He viewed the items after [Huffman] left and identified them as" belonging to Aiken. In his deposition, Goss

_____

[2] Goss testified that, "in the metal industry, it's not uncommon for girlfriends and wives to bring metal in and drop them off. It happens all the time."

denied ever speaking to Huffman.

Over the course of the next few days, Goss repeatedly contacted Officer Ethridge to ask how the case was progressing and whether an arrest had been made. While still waiting to view the video, Officer Ethridge contacted a local magistrate and obtained a warrant for Huffman's arrest for receiving stolen goods[3] based on the information he obtained from Aiken and Sunshine. After learning of the warrant for her arrest, Huffman voluntarily went to the Sheriff's Department and spoke with Ethridge. In her statement, Huffman advised Ethridge she sold metal to Sunshine on the day in question but it was not stolen; rather, it was salvaged from a mobile home belonging to Huffman and her husband that the couple were in the process of tearing down. Huffman provided Ethridge with metal similar to what she took to Sunshine and pictures of the mobile home from which she removed the metal.

Following their discussion, Officer Ethridge arrested Huffman, placed her in handcuffs, and transported her to the detention center where she was required to change into a prison jumpsuit and wait for the next bond hearing. Huffman was not allowed to call to check on her children, who were home alone,[4] and was required to appear at the bond hearing handcuffed and shackled. Huffman obtained a personal recognizance bond, and was released at approximately 5:00 p.m.

After Huffman's arrest and release—more than seventeen days after the theft from Aiken—Officer Ethridge finally viewed the video of Huffman dropping off her items at Sunshine. The video depicted Huffman removing some copper wiring from her red truck that resembled the copper taken from Aiken, and some aluminum siding, not wire. Around the same time, Goss received a copy of the video from Sunshine. Goss testified the video "clearly" showed Huffman unloading "a little small pile of copper," then a black male in a white Ford truck coming in *after* Huffman and unloading "massive [] quantities of copper and aluminum out of his truck." Rich never viewed the video. Ethridge informed Rich "that after viewing the video[,] it d[id] not show [Huffman] with the same items that w[ere] taken. Due to these facts there is not enough evidence to support this case." Days later, the black

---

[3] Receiving stolen goods is a "misdemeanor triable in magistrate[']s court or municipal court . . . if the value of the property is two thousand dollars or less." S.C. Code Ann. § 16-13-180 (2015).

[4] At the time in question, Huffman's two children were approximately six and sixteen years old.

male in question was identified as Eugene James. The Sheriff's Department located James, he admitted to stealing the wire from Aiken, and pled guilty.

Huffman filed a complaint against the Sheriff's Department, Aiken, and Sunshine asserting negligence, false imprisonment, and malicious prosecution. The trial court granted summary judgment as to both Sunshine and Aiken and Huffman appealed.

The court of appeals reversed the trial court's rulings and remanded the case to the lower court. *Huffman*, 417 S.C. at 532, 790 S.E.2d at 411. As to Huffman's false imprisonment claims, the court of appeals found there were genuine factual issues material to the unlawfulness of Huffman's arrest and the complicity of both Sunshine and Aiken in her arrest. *Id.* at 523, 709 S.E.2d at 406. The court of appeals found the trial court erred in granting summary judgment to Sunshine and Aiken on Huffman's malicious prosecution claims because there were genuine factual issues material to probable cause as well as the complicity of Sunshine and Aiken in proceeding with the charge of receiving stolen goods against Huffman. *Id.* at 530, 709 S.E.2d at 410.

Following the denial of Sunshine and Aiken's petition for rehearing, we granted Sunshine's and Aiken's separate petitions for writs of certiorari to review the court of appeals' decision.

## II.    Standard of Review

This Court reviews the grant of a summary judgment motion under the same standard applied by the trial court pursuant to Rule 56(c), SCRCP. *Woodson v. DLI Props., LLC*, 406 S.C. 517, 528, 753 S.E.2d 428, 434 (2014). Summary judgment is properly granted when, viewing the evidence and inferences to be drawn therefrom in a light most favorable to the nonmoving party, the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c), SCRCP; *Woodson*, 406 S.C. at 528, 753 S.E.2d at 434.

"In determining whether any triable issues of fact exist for summary judgment purposes, the evidence and all the inferences [that] can be reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party . . . [who] is only required to submit a mere scintilla of evidence in order to withstand a motion for summary judgment." *Hancock v. Mid-S. Mgmt.*, 381 S.C. 326, 329–31,

673 S.E.2d 801, 802–03 (2009).

### III.     Discussion

**A. Sunshine**

Sunshine's argument is twofold. First, Sunshine claims the court of appeals erred in imposing an unprecedented duty on a witness to perform its own investigation before assisting law enforcement with their criminal investigation. Sunshine claims such a duty has never been recognized in this state. Second, Sunshine contends the court of appeals erred in reversing the trial court's grant of summary judgment as to Huffman's false imprisonment and malicious prosecution claims. Specifically, Sunshine maintains that, even if we were to find a witness has a duty to investigate, the court of appeals erred in concluding Huffman offered sufficient evidence to survive Sunshine's motion for summary judgment. We agree and, therefore, reverse the court of appeals' decision as to Sunshine.

#### 1.     Creation of an unprecedented duty

False imprisonment consists of depriving a person of his or her liberty without lawful justification. *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 440, 629 S.E.2d 642, 651 (2006). "To prevail on a claim for false imprisonment, the plaintiff must establish: (1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful." *Id.* "The fundamental issue in determining the lawfulness of an arrest is whether there was probable cause to make the arrest." *Id.* at 441, 629 S.E.2d at 651. "Probable cause is defined as a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious man, under the circumstances, to believe likewise." *Id.*

To sustain an action for malicious prosecution, "a plaintiff must establish: (1) the institution or continuation of original judicial proceedings; (2) by or at the instance of the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage." *Law*, 368 S.C. at 435, 629 S.E.2d at 648. "Malice is defined as 'the deliberate intentional doing of a wrongful act without just cause or excuse.'" *Eaves v. Broad River Elec. Co-Op., Inc.*, 277 S.C. 475, 479, 289 S.E.2d 414, 416 (1982) (quoting *Margolis v. Telech*, 239 S.C. 232, 238, 122 S.E.2d 417, 419–20 (1961)). This Court has found:

Malice does not necessarily mean a defendant acted out of spite, revenge, or with a malignant disposition, although such an attitude certainly may indicate malice. Malice also may proceed from an ill-regulated mind which is *not sufficiently cautious* before causing injury to another person. Moreover, malice may be implied where the evidence reveals a disregard of the consequences of an injurious act, without reference to any special injury that may be inflicted on another person. Malice also may be *implied* in the doing of an illegal act for one's own gratification or purpose without regard to the rights of others or the injury which may be inflicted on another person. In an action for malicious prosecution, malice may be *inferred* from a lack of probable cause to institute the prosecution.

*Law*, 368 S.C. at 437, 629 S.E.2d at 649 (emphasis added). It is the plaintiff's burden "to show that the prosecuting person or entity lacked probable cause to pursue a criminal or civil action against him." *Id.* at 436, 629 S.E.2d at 649.

The notion that a private individual may face potential liability for false imprisonment is recognized in South Carolina. *Wingate v. Postal Tel. & Cable Co.*, 204 S.C. 520, 528, 30 S.E.2d 307, 311 (1944) ("The charge of false imprisonment is not confined to the party who unlawfully seizes or restrains another, but it likewise extends to any person who may cause, instigate or procure an unlawful arrest."). As this Court definitively stated in *Wingate*, it is "well settled that where a private person induces an officer by request, direction or command to unlawfully arrest another, he is liable for false imprisonment." *Id.*; *see Whitmire v. Publix Theatre Corp.*, 164 S.C. 487, 162 S.E. 753 (1931) (finding evidence justified the jury's conclusion theater representative's actions caused plaintiff's arrest by requesting police return plaintiff to the theater for an investigation); *Falls v. Palmetto Power & Light Co.*, 117 S.C. 327, 109 S.E. 93 (1921) (holding sufficient evidence from which the jury could conclude power company's general manager acted unreasonably and without ordinary prudence in calling for the arrest of plaintiff who sold similar goods as those stolen from power company).

Although the court of appeals referenced the key language in *Wingate*, its decision effectively expanded the holding to impose a duty on witnesses and victims to investigate and analyze evidence in the same manner as law enforcement. We do not interpret *Wingate*, or its progeny, to require a witness or victim to conduct their own investigation into the offense committed in order to verify the information they provide. To interpret *Wingate* in such a manner would improperly subject witnesses

and victims, who act in good faith when assisting law enforcement, to civil liability. *See Wingate*, 204 S.C. at 528, 30 S.E.2d at 311 ("Those who honestly seek the enforcement of the law . . . and who are supported by circumstances sufficiently strong to warrant a cautious man in the belief that the party suspected may be guilty of the offense charged, should not be made unduly apprehensive that they will be held answerable in damages." (citation omitted)).

Other jurisdictions have categorically refused to accept such a standard on public policy grounds and we chose to follow suit. *See, e.g.*, *Brice v. Nkaru*, 220 F.3d 233, 238–39 (4th Cir. 2000) ("[W]e are aware of no authority supporting the novel proposition that a witness, by honestly providing information to a law enforcement official, may be held responsible for the official's execution of his independent duty to investigate."); *Lawson v. Kroger Co.*, 997 F.2d 214, 217 (6th Cir. 1993) (stating a reporting victim "may not provide false information with an improper motive, but is not required to investigate offenses against it, nor must it volunteer all information within its knowledge . . . , though it may not withhold information for an improper purpose").

In sum, we find the court of appeals' decision goes too far and risks chilling public cooperation with law enforcement investigations. *See Wingate*, 204 S.C. at 528, 30 S.E. 2d at 311 ("Where a person has information or knowledge that the law has been violated, he not only has a right, but frequently it is his duty, to communicate such information or facts to the proper officer so as to give such officer the opportunity, if in his judgment it is proper to do so, to take whatever steps may be necessary to apprehend the offender."); *Elletson v. Dixie Home Stores*, 231 S.C. 565, 573, 99 S.E.2d 382, 388 (1957) ("[I]t is to be remembered that, while individuals are to be protected against rash and baseless prosecutions, the public interests demand that courts shall not frown upon honest efforts made in attempts to bring the guilty to justice . . . ."); *Turner v. Mellon*, 257 P.2d 15, 17–18 (Cal. 1953) ("The victims of crimes should not be held to the responsibility of guarantors of the accuracy of their identifications . . . . A view contrary to that . . . would, we think, inevitably tend to discourage a private citizen from imparting information of a tentative, honest belief to the police and, hence, would contravene the public interest which must control."), *abrogated on other grounds by Hagberg v. Cal. Fed. Bank FSB*, 81 P.3d 244 (Cal. 2004).

This is not to say any individual who acts in bad faith or knowingly reports incorrect information to law enforcement cannot be held liable for false imprisonment or malicious prosecution. *See Reaves v. Westinghouse Elec. Corp.*, 683 F. Supp. 521, 525 (D. Md. 1988) ("The tort of false arrest is predicated upon

*knowing* misconduct."). There is a distinct difference between an individual who, in good faith, reports mistaken or inaccurate information and an individual who *purposely* provides law enforcement with *knowingly false information. See Brice*, 220 F.3d at 238 ("[T]he critical question is whether the witness provided the police with his honest or good faith belief of the facts."). However, we find punishing an individual who mistakenly identifies a criminal suspect or unwittingly provides what is later discovered to be incorrect information in a criminal investigation serves no purpose. *See Jones v. Autry*, 105 F. Supp. 2d 559, 561 (S.D. Miss. 2000) (noting "the law allows wide latitude for honest action" by parties who assist law enforcement); *Shires v. Cobb*, 534 P.2d 188, 189 (Or. 1975) ("[P]ublic policy will protect the victim of a crime who, in good faith and without malice, identifies another as the perpetrator of the crime, although that identification may, in fact, be mistaken.").

With the above framework in mind, we turn to Sunshine's argument that the court of appeals erred in concluding Huffman presented the scintilla of evidence required to survive Sunshine's motion for summary judgment on Huffman's claims for false imprisonment and malicious prosecution.

## 2. False imprisonment

The court of appeals noted Officer Ethridge testified that when he visited Sunshine, "*[t]hey* were guaranteeing that the metal that [Huffman] brought in was the metal -- [Goss] was saying this is 100 percent our metal from [Aiken] and the [receipt] was showing the weights, everything, was . . . everything was looking the same." *Huffman*, 417 S.C. at 529, 790 S.E.2d at 409. The court of appeals concluded this statement demonstrated Sunshine's "complicity" in Huffman's arrest because it was "unclear whether 'they' referred to Rich as Sunshine's agent; or Goss, as Aiken's agent; or both. Therefore, a jury could reasonably infer that either or both men made this representation." *Id.* Further, the court of appeals pointed to Rich's admission that he never asked his Spanish-speaking employee to identify the second or third person who dropped off metal on the morning in question, and Officer Ethridge's testimony that he was "told by Sunshine" that the video of the metal drop-off area showed Huffman dropping off the stolen items as further evidence of Sunshine's culpability. *Id.* at 529–30, 790 S.E.2d at 409–10.

We find the court of appeals misapprehended the record and misapplied the summary judgment standard in coming to its conclusion. Reviewing the entirety of Officer Ethridge's deposition testimony reveals the passage quoted by the court of appeals was simply a clarification by Ethridge that *Goss* was speaking the entire

time. Accordingly, we find the court of appeals erred in morphing Ethridge's testimony into a genuine issue of material fact from which a jury could reasonably infer that Rich, as Sunshine's agent, made the representation. *See Shuler v. Tuomey Reg'l Med. Ctr.*, 313 S.C. 225, 227, 437 S.E.2d 128, 130 (Ct. App. 1993) ("It is not sufficient [to defeat a motion for summary judgment] that one create an inference which is *not reasonable* or an issue of fact that is *not genuine*." (emphasis added)). Additionally, even if the court of appeals was correct regarding the alleged ambiguity in Ethridge's "they" testimony, neither Ethridge's testimony nor the other pieces of evidence pointed to by the court of appeals support Huffman's claim for false imprisonment because there is nothing in the record that provides a reasonable inference that Sunshine or any of its employees induced, caused, instigated, or procured Huffman's arrest simply by cooperating with law enforcement and relaying information Sunshine believed to be true at the time.

### 3. Malicious prosecution

Sunshine argues the court of appeals misapprehended the law and facts presented in the record regarding Huffman's malicious prosecution claim. Additionally, Sunshine contends Huffman failed to present evidence Sunshine or any of its employees acted with malice in reporting information to and cooperating with law enforcement. We agree.

Pointing to the same evidence discussed above in relation to Huffman's false imprisonment claim, the court of appeals found that, in the light most favorable to Huffman, there was at least a scintilla of evidence from which a jury could reasonably conclude (1) Officer Ethridge lacked probable cause to pursue a warrant for Huffman's arrest, and (2) this pursuit was at the insistence of *both* Sunshine and Aiken.

We find the court of appeals erred in reversing the trial court's grant of Sunshine's motion for summary judgment as to Huffman's malicious prosecution claim because Huffman failed to present a scintilla of evidence that Sunshine instituted the proceedings against her or that the proceedings were instituted at the instance of Sunshine. *See Elletson*, 231 S.C. at 573, 99 S.E.2d at 388 (noting that while individuals are to be protected against "rash and baseless prosecutions," public interests require that courts not punish honest efforts "to bring the guilty to justice"). Accordingly, we reverse the court of appeals' decision as to Sunshine.

### B. Aiken

Aiken's primary challenge to the court of appeals' decision is that Huffman's claims should be barred as a matter of law pursuant to article I, section 24 of the South Carolina Constitution (the Victims' Bill of Rights) and section 16-3-1505 of the South Carolina Code (2015).[5] Additionally, Aiken contends the court of appeals erred in relying on inadmissible evidence in reaching its decision. However, unlike Sunshine, Aiken does not directly challenge the sufficiency of the evidence presented by Huffman. We disagree with Aiken's contentions and affirm the court of appeals' decision as to Aiken.

## 1. The Victims' Bill of Rights and § 16-3-1505 of the South Carolina Code

Aiken argues the court of appeals overlooked, and failed to address and consider whether Huffman's claims were barred by the Victims' Bill of Rights and section 16-3-1505. Aiken argues this oversight is contrary to the court of appeals' duties and responsibilities under Rule 220(b), SCACR,[6] and "waters down the rights guaranteed to victims of crime by the Constitution and statutes regarding victims of crime."

The Victims' Bill of Rights provides that victims of crimes have the right to:

(1) be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal and juvenile justice process, and informed of the victim's constitutional right, provided by statute;

---

[5] Aiken raised this argument in its brief to the court of appeals; however, the court chose not to address the matter pursuant to *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("It is within the appellate court's discretion whether to address any additional sustaining grounds."). *Huffman*, 471 S.C. at 518 n.1, 790 S.E.2d at 404 n.1. Aiken raised the issue again in its petition for rehearing; however, the petition was denied.

[6] "In every decision rendered by an appellate court, every point distinctly stated in the case which is necessary to the decision of the appeal and fairly arising upon the record of the court must be stated in writing and must, with the reason for the court's decision, be preserved in the record of the case." Rule 220(b), SCACR.

. . . .

(6) be reasonably protected from the accused or persons acting on his behalf throughout the criminal justice process;

(7) confer with the prosecution, after the crime against the victim has been charged, before the trial or before any disposition and informed of the disposition;

. . . .

(11) a reasonable disposition and prompt and final conclusion of the case . . . .

S.C. Const. art. I, § 24(A)(1), (6), (7), (11).

Section 16-3-1505 encompasses the legislative intent portion of the South Carolina Victim and Witness Service Act and states, in relevant part:

In recognition of the civic and moral duty of victims of and witnesses to a crime to cooperate fully and voluntarily with law enforcement and prosecution agencies, and in further recognition of the continuing importance of this citizen cooperation to state and local law enforcement efforts and to the general effectiveness and the well-being of the criminal and juvenile justice systems of this State, and to implement the rights guaranteed to victims in the Constitution of this State, the General Assembly declares its intent, in this article, to ensure that all victims of and witnesses to a crime are treated with dignity, respect, courtesy, and sensitivity; that the rights and services extended in this article to victims of and witnesses to a crime are honored and protected by law enforcement agencies, prosecutors, and judges in a manner no less vigorous than the protections afforded criminal defendants . . . .

S.C. Code Ann. § 16-3-1505.

As to the portion of Aiken's argument regarding the Victims' Bill of Rights, this Court has never interpreted the Victims' Bill of Rights as providing a defense to victims accused of false imprisonment or malicious prosecution, and Aiken has failed to cite any case law in support of its contention. *See Savannah Bank, N.A. v.*

*Stalliard*, 400 S.C. 246, 253 n.3, 734 S.E.2d 161, 164 n.3 (2012) (stating an issue is deemed abandoned if the argument in the brief is not supported by authority or is only conclusory). Additionally, the incidents in which the appellate courts of this state have referred to the Victims' Bill of Rights have all occurred in a criminal setting, not a civil one as in the instant case. *See Ex parte Littlefield*, 343 S.C. 212, 221, 540 S.E.2d 81, 85 (2000) (finding once a criminal case has been resolved and the defendant sentenced, the victim loses his or her status under the Victims' Bill of Rights); *Reed v. Becka*, 333 S.C. 676, 683–84, 511 S.E.2d 396, 400 (Ct. App. 1999) (holding solicitors' prosecutorial discretion is not contracted or limited by the victims' rights laws).

As to Aiken's claim regarding section 16-3-1505, we have recognized the primary purpose of the statute is to ensure "victims are informed of their rights and any alternative means that might be available to them if the criminal prosecution is unable to meet their needs." *Ex parte Littlefield*, 434 S.C. at 218, 540 S.E.2d at 84. Further, we have stated that "while the legislative intent section indicates the General Assembly recognizes the importance of the people's civic duty to cooperate with law enforcement, *there is no indication the General Assembly intended this concept to extend outside the context of the ongoing criminal proceeding at the heart of this statute*." *Taghivand v. Rite Aid Corp.*, 411 S.C. 240, 246, 786 S.E.2d 385, 388 (2015) (emphasis added). Accordingly, we find Aiken's arguments to be without merit.

### 2. Inadmissible evidence

Aiken argues the court of appeals' decision was improperly based on inadmissible evidence. Specifically, Aiken argues Officer Aldridge's testimony that Goss "imposed a sense of urgency on the case" when communicating with law enforcement was inadmissible opinion testimony by a lay witness in violation of Rule 701 of the South Carolina Rules of Evidence. Further, Aiken notes the only other evidence relied on by the court of appeals came from Officer Ethridge who testified Goss "wanted to know what I was going to do [with the case]. Was I going to arrest [Huffman], lock her up . . ." and stated Goss was "calling [Ethridge] just like any other victim would."

Rule 701 states, if a witness is testifying as a lay witness

the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which (a) are rationally based on the perception of the witness, (b) helpful to a clear understanding of the

witness' testimony or the determination of a fact in issue, and (c) do not require special knowledge, skill, experience or training.

Rule 701, SCRE.

During Officer Aldridge's deposition, the following exchange occurred between Aiken's attorney and Aldridge:

Q:      Do you recall anything that you haven't told us that was said by Mr. Goss of Aiken Electric?

A:      The one thing that does stick out in my head as far as my interaction with Mr. Goss was that he imposed a sense of urgency on the case.

Q:      All right.

A:      I'm not exactly sure what had been done or what conversation had transpired before my interactions with him, but there did seem, to be a sense of urgency on his part to get some resolution of the incident.

. . . .

Q:      Is it unusual for victims of crimes to want to see law enforcement take action?

A:      Generally, victims are more pressed than not to have law enforcement resolve their issues.

Q:      And I would assume law enforcement has to do it at its own pace, but sometimes victims are frustrated by the delay and the process of taking a case forward?

A:      Right.  Right.  And it's completely common.

During Officer Ethridge's deposition, he testified Goss called him "several times about moving further with the case" and "want[ed] to know what [Ethridge] was doing [in regards to the case]."  Ethridge further testified:

I didn't have the video at that point in time so [Goss] wanted to know

what I was going to do.  Was I going to try and arrest [Huffman], lock her up, you know, speaking with a magistrate, what to do.  On the 21st, that's what I did is [sic] I went and spoke with a magistrate.

Q:      Did you feel that [Goss] was urging you to prosecute [Huffman]?

. . . .

A:      He was calling me.  He was calling me just like any other victim would.  You know, what are you doing?  You know, what -- I mean, he had people he had to answer to . . . .

. . . .

Q:      Okay.  And the reason he was calling you is because he wanted–

A:      To know what I was going to do with the case.  Was I . . . going to arrest [Huffman].

We find Officer Aldridge's and Officer Ethridge's testimony was based on their perceptions of their interactions with Goss; did not require special knowledge, skill, experience, or training; and did not stray into the realm of expert testimony. *See* Rule 701, SCRE (noting lay witness testimony is limited to the witness's opinions or inferences which are rationally based on the witness's perception, and that do not require "special knowledge, skill, experience or training").  Accordingly, we find the court of appeals did not err in relying on or basing a portion of its ruling on the two officers' testimony.

## IV.    Conclusion

Based on the foregoing, we reverse the court of appeals' decision as to Sunshine and affirm the opinion as to Aiken.

**AFFIRMED IN PART AND REVERSED IN PART.**

**KITTREDGE, HEARN, FEW and JAMES, JJ., concur.**