**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Lisa Styles, Respondent-Appellant,

v.

Southeastern Grocers, Inc. and BI-LO, LLC, Appellants-Respondents.

Appellate Case No. 2020-000818

—————

Appeal from Anderson County
R. Scott Sprouse, Circuit Court Judge

—————

Unpublished Opinion No. 2023-UP-319
Heard April 13, 2023 – Filed September 27, 2023

—————

**AFFIRMED**

—————

Andrew J. McCumber, of Slotchiver & Slotchiver, LLP, of Mount Pleasant, and David Shankman, of Shankman Leone, PA, of Tampa, FL, for Appellants-Respondents.

Brian P. Murphy, of Stephenson & Murphy, LLC, of Greenville, for Respondent-Appellant.

—————

**PER CURIAM:** In this false imprisonment action, Southeastern Grocers, LLC, and BI-LO, LLC, appeal a jury verdict in favor of Lisa Styles (Styles). BI-LO[1] argues that (1) the circuit court erred in not granting its motion for JNOV on Styles's claim of false imprisonment; (2) certain evidentiary rulings by the circuit court were flawed; and (3) the circuit court should have granted its motion for a JNOV or a new trial on damages. We affirm.[2]

On May 23, 2018, Styles—the customer service manager at the Pendleton BI-LO—was summoned to the store office for a meeting with two visiting BI-LO officials: Ronnie Duncan, who worked in loss prevention, and Ken Miller, a human resources representative. Styles quickly developed a troubling feeling about the meeting. After a quick greeting, according to Styles, "they told me they were investigating me taking product." Styles—in a written statement she later said was obtained under duress—admitted she had done so. Styles signed the statement and was subsequently terminated.[3] On the way home, Styles pulled her car to the side of the road and vomited. She later experienced a "flare-up" of a latent infection.

The next day, Styles went to the local police department to insist on her innocence. Styles told Police Chief Doyle Burdette that the items she took from the store were actually donations to a local charity. As proof, Styles forwarded an email to the chief in which Marla Cobb, a program director for Anderson Interfaith Ministries (AIM), expressed gratitude for "you guys . . . taking this on." After an investigation, Chief Burdette took his report to a judge. The judge declined to issue an arrest warrant for Styles.

Styles then filed this action. Her complaint included causes of action for abuse of process, malicious prosecution, false imprisonment, interference with contract (against the store's manager, Michael Brickman), and fraud. Soon after, she dropped all the claims against the individual defendants, including the contractual claim against Brickman.

At trial, Styles testified that she had complained to a district manager about clashes with Brickman and collected statements from other employees and submitted them to a corporate official in Jacksonville. Customers also complained.

---

[1] For ease of reference, we will refer to the two companies collectively as BI-LO, even when Southeastern Grocers is the entity technically involved at a given point.

[2] Because we affirm, we do not reach Styles's conditional cross-appeal.

[3] Styles also admitted the theft to a police officer.

Styles testified that discussions among the management team at the store led to a joint decision to donate Easter baskets to AIM. According to Styles, she got further approval from Brickman to donate some women's hygiene products to AIM. Styles said she gave Brickman a list of the items she had donated. She conceded that she did not make a personal copy of the list, "[b]ut I sure wish I would have."

Not long after the donations, Styles noticed Brickman spending time in the store's office reviewing footage from the store's security cameras. On April 14, she reached out to Brickman by text to find out if she had reason to worry. She wrote: "[S]everal comments have gotten back to me. Do I need to know something? Several people have told me you have been watching me on camera. I'm fine with you watching me on camera[;] I am not aware I'm doing something wrong. If I am[,] I would appreciate you telling me." Brickman never responded to the text.

By then, according to the testimony of Brickman and Duncan, Brickman had already texted Duncan to alert him to two potential incidents of theft on March 24. Brickman testified at trial that he had happened upon the footage of Styles's alleged thefts while looking into some issues the store was having with cleaning. Duncan's own review of the security footage appeared to show Styles purchasing some items, then picking up additional items that she had placed in other parts of the store before leaving.

Testimony about the subsequent meeting of Styles, Duncan, and Miller varied. According to Styles, she explained to Duncan and Miller that the goods were donated to charity. She told them she believed that the investigation was related to her complaints about Brickman. She "asked to leave that room several times," but Duncan told Styles she could not. When she took a cigarette break, Miller escorted her. She was told that to leave the room, she would have to write a statement confessing that she stole the items.

For his part, Miller denied that Styles requested being allowed to leave. According to Miller's testimony, Styles was not told that she had to give a statement before she could leave. Furthermore, Miller said he did not formally escort Styles on her break but went along as "the human resources people person." On cross-examination, Miller said that by the time of the meeting, he was aware that there were "concerns" about Brickman's "management style." Miller said he was not aware of the details. However, Miller knew Styles had complained; Brickman had told him. Miller terminated Styles that day.

Duncan, recalling the meeting during his testimony, said Styles almost immediately brought up the fact that she had donated the items to AIM. However, he remembered thinking that the items "had not been scanned out" by Styles, as was typically done with inventory leaving the store for any purpose—even to get thrown away. Significantly, according to Duncan, Styles said the donations were not approved. He quoted Styles as saying: "Mike [Brickman] said that he would not approve it, that -- that he already had someone else for that month to donate to."[4] According to Duncan, she added: "Well, we've been doing this over, you know, the last couple of years, and I decided that I was going to assist AIM, you know, without permission."[5] Duncan said Styles also admitted taking some of the product for her personal use. Like Miller, Duncan testified that Styles was not prevented from leaving. Duncan said he did not know that Styles had separately complained about Brickman.

At the end of all testimony, BI-LO renewed previous motions for directed verdicts. Styles voluntarily dismissed the abuse of process claim. The circuit court granted a directed verdict on the malicious prosecution claim. After closing statements and jury instructions, the jury found for Styles on false imprisonment and awarded her $100,000 in compensatory damages; it found for BI-LO on the fraud claim. The jury awarded Styles $10,000 in punitive damages. Later, in a Form 4 order with some reasoning attached, the circuit court denied all post-trial motions, including those relevant to this appeal, which followed.

Our supreme court instructs that appellate courts reviewing JNOV rulings "must apply the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party." *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 331–32, 732 S.E.2d 166, 171 (2012). In turn, the circuit court "must deny a motion for a directed verdict or JNOV if the evidence yields more than one reasonable inference or its inference is in doubt. Moreover, '[a] motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict.'" *Id.* at 332, 732 S.E.2d at 171 (citation omitted) (quoting *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998)).

---

[4] Duncan also testified that "the way the donations were done" by Styles would have violated company policy even if Brickman had approved them.

[5] Cobb, AIM's program director, testified that "BI-LO had assisted us previously the year before with some Easter basket donations."

As for a circuit court's evidentiary determinations, "this [c]ourt will not disturb a [circuit] court's evidentiary rulings absent a clear abuse of discretion. The [circuit court's] decision will not be reversed on appeal unless it appears he clearly abused his discretion and the objecting party was prejudiced by the decision." *Seabrook Island Prop. Owners' Ass'n v. Berger*, 365 S.C. 234, 242, 616 S.E.2d 431, 435 (Ct. App. 2005) (citations omitted).[6]

## I. JNOV ON FALSE IMPRISONMENT

BI-LO argues that the circuit court should have granted JNOV on Styles's false imprisonment claim because she was not restrained and that its employees had probable cause to detain her. We hold that the circuit court did not err.

Recently, our supreme court reiterated the elements of false imprisonment under South Carolina law. "To prevail on a claim for false imprisonment, the plaintiff must establish: (1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful." *Huffman v. Sunshine Recycling, LLC*, 426 S.C. 262, 271, 826 S.E.2d 609, 614 (2019) (quoting *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 440, 629 S.E.2d 642, 651 (2006)). Here, we place the first two elements under the combined rubric of "intentional restraint" because we do not understand BI-LO to be challenging whether any restraint was intentional.

Styles clearly presented enough evidence on intentional restraint to send the case to the jury. The standard for "restraint" in South Carolina does not require as much imposition on the plaintiff as the word conjures in isolation.

> The tort of false imprisonment may be committed by words alone, or by acts alone or by both, and by merely operating on the will of the individual, or by personal

---

[6] Styles raises a preservation challenge to virtually every argument advanced by BI-LO in this appeal. At best, these arguments represent the kind of hyper-technical application of preservation rules that our jurisprudence warns against. *See Herron v. Century BMW*, 395 S.C. 461, 470, 719 S.E.2d 640, 644 (2011) (recognizing "the need to approach issue preservation rules with a practical eye and not in a rigid, hyper-technical manner"); *State v. Bowers*, 428 S.C. 21, 29, 832 S.E.2d 623, 627 (Ct. App. 2019) ("[I]ssue preservation is not a 'gotcha' game. Instead of being hyper-technical, we approach preservation with a practical eye." (citation omitted)), *aff'd*, 436 S.C. 640, 875 S.E.2d 608 (2022). At worst, some are meritless. As a result, we do not address them.

violence, or by both. It is not necessary that the individual be confined within a certain area, or that he be assaulted, or even touched.

*Gathers v. Harris Teeter Supermarket, Inc.*, 282 S.C. 220, 230–31, 317 S.E.2d 748, 755 (Ct. App. 1984).

In its brief, BI-LO raises several reasons to find that Styles was not restrained by Duncan and Miller. BI-LO contends that Styles could not have been falsely imprisoned because she voluntarily entered the office; she was on-duty at the time of the meeting; she was not subject to any physical impositions; she could reach the door if necessary; she was not threatened; and she remained long after, allegedly, she first felt that she was in some form of employment danger.

Were that the only evidence introduced at trial, BI-LO might prevail in this appeal. However, there was also contradictory evidence put before the jury. "Self-serving" or not, Styles testified that she was told she could not leave the room until she produced a statement and that she was required to be escorted during the break in her detention. Either BI-LO or Styles is right about what occurred inside the office of the Pendleton store that afternoon, and the other is wrong. Determining which one of those stories is correct is why we have juries. *See Sauers v. Poulin Bros. Homes, Inc.*, 328 S.C. 601, 605, 493 S.E.2d 503, 505 (Ct. App. 1997) ("When considering the motions [for a directed verdict or JNOV], neither this [c]ourt nor the trial court has authority to decide credibility issues or to resolve conflicts in the testimony and evidence.").

Like the circuit court, our considerations in this case involve not whether Styles met her burden of proof, but whether Styles introduced enough evidence to create a factual dispute on this question. She did.

Any intentional restraint of Styles by BI-LO employees, though, would be allowed if they were legally entitled to do so. With regard to this aspect of false imprisonment, the parties spend a great deal of time arguing about whether BI-LO's employees had probable cause to detain Styles. However, we are not entirely bound by the discussions of BI-LO and Styles. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal."). Instead, we will focus on the applicability of statutory and common law provisions allowing a shopkeeper or merchant to detain an employee or customer to prevent theft (Shopkeeper's Statute). As a result, we affirm.

There is some question about whether the Shopkeeper's Statute applies in this case, or at least was applied on the record in front of us. There are several instances in the record where the doctrine is discussed, often in contradictory ways. In any event, whether the Shopkeeper's Statute was applicable or not, the result is the same.

> In any action brought by reason of having been delayed by a merchant or merchant's employee or agent on or near the premises of a mercantile establishment for the purpose of investigation concerning the ownership of any merchandise, it shall be a defense to such action if: (1) The person was delayed in a reasonable manner and for a reasonable time to permit such investigation, and (2) reasonable cause existed to believe that the person delayed had committed the crime of shoplifting.

S.C. Code Ann. § 16-13-140 (2015).

In *Faulkenberry v. Spring Mills, Inc.*, our supreme court found that the statute could be used to justify the detention of an employee accused by co- workers of preparing to steal some of the mill's product. 271 S.C. 377, 378–80, 247 S.E.2d 445, 446–47 (1978). Reading the statute in concert with similar common law doctrine, the court also held that "[s]uch actions . . . can only be justified *during the commission of the suspected wrongdoing*." *Id.* at 380, 247 S.E.2d at 447 (emphasis added).

Even if we consider BI-LO's argument on the probable cause aspect to implicitly reflect common law protections for retailers rather than the statute itself, we note that modern treatises continue to hold to the view that this kind of detention is allowed only in proximity to the commission of a crime. *See* RESTATEMENT OF EMPLOYMENT LAW § 4.06, cmt. d (Am. Law Inst. 2015) ("Employers also have a privilege to restrain their employees to *prevent* injury to others or theft. Such a restraint must be reasonably necessary to avert an injury or theft that the employer has *reasonable cause to believe is occurring or is imminent*, and it cannot exceed the time and manner reasonably necessary to do so." (emphases added)); 35 C.J.S. *False Imprisonment* § 29 (May 2023 update) ("Merchants have limited authority under the shoplifting detention statutes to detain persons suspected of theft, triggered when a merchant's agent has reasonable suspicion or probable cause to believe that a theft *has occurred or is occurring on or about the store premises*."); 32 AM. JUR. 2d *False Imprisonment* § 65 (May 2023 update) ("The right to detain the person suspected of wrongdoing exists only

during commission of the offense and does not arise where the offense was completed at a prior time. There is no privilege[] if the victim is not detained for an investigation but is held for the purpose of compelling restitution or securing a confession for a prior theft." (footnotes omitted)); *see also State v. McAteer*, 340 S.C. 644, 646, 532 S.E.2d 865, 865 (2000) (holding that "South Carolina recognizes no common law right of a citizen to arrest, without a warrant, for a misdemeanor" (footnote omitted)); S.C. Code Ann. § 16-13-110(B)(1) (2015) (classifying shoplifting of merchandise worth two thousand dollars or less as a misdemeanor).[7]

Under either the statutory or common law considerations, the shopkeeper's privilege does not support BI-LO's view that a finding of probable cause is tantamount to a finding that BI-LO had legal authority to detain Styles. Here, Styles was not detained as she was taking items from the store. She was held in the office weeks later. This falls outside of the protection of *Faulkenberry* and its common law counterparts. *See Faulkenberry*, 271 S.C. at 379, 247 S.E.2d at 447 ("Moreover, the right to detain the person suspected of wrongdoing exists only during commission of the offense, and does not arise where the offense was completed at some prior time." (quoting 32 AM. JUR. 2d *False Imprisonment* § 74)).

Some authorities support the view that BI-LO was free to ask Styles to speak to Duncan and Miller on pain of termination if she refused. *See* RESTATEMENT OF EMPLOYMENT LAW § 4.06, cmt. d ("[E]mployers may tell their employees that they will be discharged if they do not submit to an investigation into possible theft or other workplace malfeasance. Employers also may inform their employees that if they do not cooperate with an investigation conducted in good faith, the employees will be referred to public authorities for prosecution."). But in order for BI-LO to avoid liability for false imprisonment, Styles needed to be offered the opportunity to leave. *See Law*, 368 at 440, 629 S.E.2d at 651 ("The essence of the tort of false imprisonment consists of depriving a person of his liberty without lawful justification."). As explained, the jury found she was not offered the opportunity to leave. For that reason, we affirm.

## II.   EVIDENTIARY ISSUES

BI-LO next argues that evidence of complaints about Brickman's behavior at the store was too prejudicial to be admitted under Rule 403, and that Chief

---

[7] Styles's statement estimated the value of the items she took at "around $450.00," and she paid the company $450 to reimburse it for the allegedly stolen goods.

Burdette's testimony was impermissibly used to bolster Styles's testimony and to confuse the issue of probable cause. The circuit court did not abuse its discretion.

Initially, we disagree with BI-LO's contention that "while Plaintiff only brought tort claims in this action, she was allowed to turn this trial into a case about gender discrimination, harassment[,] and retaliation." To the contrary, our review of the record shows that the circuit court did an admirable job of preventing the trial from turning into the "#metoo"-infused culture war that BI-LO portrays in its brief. For example, the court excluded any evidence about the way Brickman looked at women.

However, to the extent that the tensions between Styles and Brickman were captured in the testimony and evidence that was admitted, there was no error. The conflict between the two was central to Styles's theory of the case—that she was falsely imprisoned because of Brickman's scheme to frame her for stealing merchandise and that BI-LO employees knew or should have known this, thus depriving them of probable cause to detain her. By attempting to minimize the attention focused on gender while largely allowing the introduction of evidence of bitterness between Styles and Brickman, the circuit court struck the appropriate balance. The admitted evidence was not unduly prejudicial.

As to BI-LO's relevancy objections, we note that the strictures of Rule 401, SCRE, are not taxing. *See State v. Sweat*, 362 S.C. 117, 126–27, 606 S.E.2d 508, 513 (Ct. App. 2004) ("Evidence is relevant if it tends to establish or make more or less probable some matter in issue upon which it directly or indirectly bears, and it is not required that the inference sought should necessarily follow from the fact proved."); 29 Am. Jur. 2d *Evidence* § 294 (May 2023 update) ("Under the modern rules of evidence, the threshold to admit relevant evidence is low[,] and *even minimally relevant evidence is admissible*." (emphasis added)); *id.* ("To be relevant, evidence need not bear directly on the question in issue *if it is helpful to understand the conduct of the parties or their motives* or if it reasonably allows the jury to draw an inference as to a disputed fact; the value of the evidence need only be slight." (emphasis added)); 31A C.J.S. *Evidence* § 283 (May 2023 update) ("Under the Federal Rules of Evidence, and similar state rules and statutes, 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. To be probable, evidence must be viewed in the light of logic, experience[,] and accepted assumptions concerning human behavior." (footnotes omitted)). Anonymous customer complaints are not the stuff that airtight cases are made of, but they need not be in order to pass our state's test for relevance. They made it at least somewhat more

likely that Brickman's behavior at the store was causing problems—a central theme of Styles's case.

As to Chief Burdette's testimony, it was certainly relevant to Styles's malicious prosecution claim, which was still alive at the time the testimony was admitted. Further, giving the "curative instruction" proposed by BI-LO— especially as it was described in the company's brief—would have come perilously close to a reversible charge on the facts.[8] Finally, we question whether any of Chief Burdette's testimony was hearsay, but given that BI-LO does not specifically identify which of Chief Burdette's statements were hearsay or how they constituted hearsay, we decline to build BI-LO's case for it.

## III. DAMAGES

BI-LO argues that it is entitled to a JNOV or a new trial on the compensatory and punitive damage awards from the jury. We disagree.

"In a suit for false imprisonment, the basic injury is the depreciation of the Plaintiff's liberty. Such things as humiliation, indignity, and mental suffering are general damages that naturally and proximately result from false imprisonment." *Zimbelman v. Savage*, 745 F. Supp. 2d 664, 683 (D.S.C. 2010) (citations omitted).

Additionally, in *Mitchell v. Fortis Insurance Company*, our supreme court attempted to clarify the relevant considerations for South Carolina courts weighing whether the amount of a jury's award of punitive damages is appropriate. 385 S.C. 570, 586–89, 686 S.E.2d 176, 184–86 (2009). As a result, the *Mitchell* court framed its analysis in terms of reprehensibility, ratio, and comparative punitive awards— with the factors from *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991), serving to "add[] substance" to those factors. *Id.*

We find no support for BI-LO's attempt to calculate damages for false imprisonment based on a minute-by-minute "rate." The damages that juries are allowed to award for false imprisonment are not as clearly defined as medical bills paid because of malpractice or the cost of repairs from negligent construction

---

[8] BI-LO asserts in its brief that "the [circuit c]ourt erred by failing to provide the jury with Defendant's proposed curative instructions to disregard [the evidence] as the abuse of process claim was dropped by Plaintiff and a directed verdict was entered on Plaintiff's malicious prosecution claim, as well as an instruction that the jury consider only the knowledge of the decision-maker (i.e., Duncan) at the time of the interview."

practices. *See Zimbelman*, 745 F. Supp. 2d at 683 ("Such things as humiliation, indignity, and mental suffering are general damages that naturally and proximately result from false imprisonment."). As a result, precise numeric calculations or formulas are not the appropriate way to consider these damages. Additionally, BI-LO attempts to argue that the verdict improperly contains compensation for the mental anguish caused by Styles's termination. But if both the imprisonment and the termination caused her mental distress, Styles was still entitled to the portion of those damages caused by the imprisonment.

Regarding punitive damages, most of the *Mitchell* and *Gamble* factors for punitive damages cut against BI-LO. For example, the ratio of punitive damages to actual damages in this case is 0.1:1. In terms of comparable cases, larger punitive awards can be found in older verdicts. *See, e.g., Caldwell v. K-Mart Corp.*, 306 S.C. 27, 33, 410 S.E.2d 21, 25 (Ct. App. 1991) (finding that award including $100,000 in punitive damages "may have been liberal[, but] we find no basis in the record to hold it grossly excessive").[9]

Furthermore, BI-LO's list of reasons for a JNOV on punitive damages often reads like a recitation of its substantive arguments against the jury's determination of false imprisonment. To the extent that BI-LO offers additional arguments here, they are similarly unconvincing. For example, BI-LO argues that there is no deterrent effect of this decision because the company will not be deterred from investigating employee theft. The punitive damages in this case, though, are meant to deter BI-LO from allowing its employees to weaponize those procedures against co-workers, not to neutralize the procedures altogether.

BI-LO's arguments for a new trial suffer from many of the same shortcomings. For example, at one point, BI-LO states: "As discussed above, Plaintiff was not able to prove at trial that she was unlawfully restrained as required for a verdict of false imprisonment." Because we see no error in the jury's finding of false imprisonment, Styles proved precisely that as a legal matter.

Furthermore, we again disagree with BI-LO's contention that the circuit court allowed the case to run off the rails and become an extension of the "#metoo" movement. We believe the circuit court did a reasonable job of keeping hot-button social issues out of the jury's consideration of the case.

**AFFIRMED.**

---

[9] We note that the *Caldwell* court did not consider a due process argument on punitive damages. *See id.* at 33–34, 410 S.E.2d at 25.

**WILLIAMS, C.J., and GEATHERS and VERDIN, JJ., concur.**