# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Gregg Pickrell, Appellant.

Appellate Case No. 2018-001139

———————

Appeal From Kershaw County
Alison Renee Lee, Circuit Court Judge
William A. McKinnon, Circuit Court Judge

———————

Opinion No. 5878
Heard February 10, 2021 – Filed December 8, 2021

———————

## AFFIRMED

———————

Chief Appellate Defender Robert Michael Dudek, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Assistant
Attorney General Mark Reynolds Farthing, and Solicitor
Byron E. Gipson, all of Columbia, for Respondent.

———————

**HUFF, J.:** Appellant, Gregg Pickrell, appeals from her murder conviction. She
first asserts the immunity hearing court erred in denying her immunity from
prosecution. She further maintains the trial court erred in allowing certain
testimony from two law enforcement officers. Because we find the record
supports the immunity hearing court's determination that Appellant failed to show
by a preponderance of the evidence that she was entitled to immunity from

prosecution, and we further find no reversible error in the admission of the challenged testimony, we affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Appellant was indicted for murder in the death of Robert Lamont "Monty" Demary (Victim), who was sometimes employed by Appellant and with whom Appellant was engaged in a sexual relationship. It is undisputed that Appellant shot Victim in her home on the morning of September 11, 2014. However, Appellant maintained she was immune from prosecution pursuant to the Protection of Persons and Property Act (the Act).[1] Following an immunity hearing, Judge Alison Renee Lee denied Appellant immunity from prosecution. Appellant was thereafter tried by a jury before Judge William A. McKinnon, was convicted as charged, and was sentenced to thirty-five years' imprisonment.

### A. Appellant's Statements to Law Enforcement[2]

Within hours of Victim's shooting, Appellant gave two statements to law enforcement. In her first interview by Kershaw County Sheriff's Investigator Rick DeVors—in the presence of then-victim's advocate, Karen DeVors—Appellant indicated Victim came to her farm house the night before, arriving by cab between 10:00 and 11:30 p.m. She explained that Victim was previously employed by her and the two began a sexual relationship in 2008, which Appellant maintained resulted in six years of physical abuse perpetrated by Victim. Appellant, a horse trainer, described a particular previous instance of abuse she suffered at Victim's hands when she took Victim and another employee, Tyrone Pearson, to Louisiana for a horse race. The police responded to the racetrack as a result of that incident, and Appellant "put [Victim] in jail" over the matter, where he stayed for sixty days for committing assault and domestic battery against her.

Appellant stated that on the night before the shooting Victim contacted her wanting money. She told him she would put the money in an envelope in the mailbox and he could "get [his] cab, and take [his] money." The next thing she knew, Victim was on her porch, at which time she offered him a drink and they ate dinner. According to Appellant, Victim threw her against a desk prior to them eating dinner, there was a verbal argument during dinner, and there was another

---

[1] S.C. Code Ann. §§ 16-11-410 to 450 (2015).
[2] Appellant's statements were introduced as evidence in both the immunity hearing and the trial.

"altercation" after dinner. Victim passed out in a chair after dinner, and Appellant then got into bed. Victim later joined Appellant in bed and they engaged in sex. When they awoke around 6:45 a.m., Victim wanted to have sex again. However, Appellant's mother was expected to be at her house soon, and Appellant told Victim she needed to get him out of there. Victim was mad about not engaging in more sex and, upon discovering he was missing one of his earrings, he "had a fit" and began swearing. Appellant told Victim the earring had to be in the bed, but Victim, who had a bad temper, said something about Appellant stealing the earring and said, "I'm going to kill you." Appellant explained that she always kept a gun in a drawer by a boom box right outside the bedroom door. She described Victim as being "[f]urious about the earring," and stated that when he was like that he "does this sort of build-up" and he "inflates." Victim told Appellant, "If I cannot find this earring, I'm going to come and fucking kill you." Appellant told him she would find the earring for him, but he said, "No, . . . I'm going to find this earring. I'm going to da-da-da-da-da . . . ." Appellant then stated as follows:

> [A]nd the next thing I knew, he, he, turned at me, and then he said, ["]I'm going to, I'm going to come and kill you,["] and then he turned to the bed, and he was looking . . . in the bed for the earring, and I thought, You know what? I'm going to get the gun, and I'm going to point it at him, and I'm going to say, ["]Monty, just come on . . . .
>
> Come on.["] And it's the first time I've ever done that because I've always been afraid to even call 911. . . .
>
> And he said, ["]I'm going to find this earring, and I'm going to fucking kill you, Gregg. I'm going to fucking kill you.["] And the next thing I knew, I, I just, I just shot the gun. I shot the damn gun. I shot the damn gun. Oh my God. And when I saw that he was — — he went down, I thought, Oh, my God, I've hit this guy. And I went and got my phone, and I called 911 right off the bat with the gun in my hand.

When Investigator DeVors asked her what about this time made her pull the trigger, she stated she had been so close to death so many times at Victim's hands. Investigator DeVors again asked what was different about this time and she replied, "I just can't take any more beating . . . and the terrible things he said about

my mother, who's helped him, and I just can't take it anymore."  She further stated, "[I]t's been six years of — — I just don't, I don't want to get hurt anymore."

Appellant reiterated that she told Victim they needed to go because she had things to do with the horses and her mother was coming over to her house.  She explained that she offered to find the earring and get it to him, but Victim "just kind of went like this at me, and he said, [']No, I'm going to find my earring . . . .  [a]nd when I do, I'm going to do you.[']"  Appellant stated Victim was referring to "the sex" he had previously been denied.  The following colloquy then occurred:

> [Appellant]:  And he said, ["]I'm going to do you, and then I'm going to kill you.  I'm going to do you, and I'm going to kill you.  I'm going to find my fucking earring.["]  I said, I will find the earring.  And he started doing this, and he started this and that, and it's just — —
>
> [DeVors]:  Tell me what happened.  So he's doing this.  He's bowing up at you.  What do you do?  What's your next move?
>
> [Appellant]:  I went and got the gun.
>
> [DeVors]:  Okay
>
> [Appellant]:  And I thought, I'm going to point the gun at him, and I'm going to say, Monty, let's go.  Let's go.  And — —
>
> [DeVors]:  But that's what you're thinking.  This is your plan:  I'm going to . . . get him out [of] here because I'm going to point this gun at him.  I'm going to get him out of here.
>
> [Appellant]:  And you're going to get out of here.
>
> [DeVors]:  Okay.  What actually happened?
>
> [Appellant]:  I didn't want him to get the gun from me.
>
> [DeVors]:  Right.

[Appellant]:  Because I knew that either I would be destroyed — —

[DeVors]: Mm-hmm — —

[Appellant]:  — — or whipped to death with the gun or something.

[DeVors]:  Yeah.  Okay.

[Appellant]:  I mean, you know, . . . he's got this movie thing going, you know, and anyway, I — — when he — — he went something like this, and I just, I just pulled the — — I pulled the trigger.

[DeVors]:  Okay.  When you . . . pulled the trigger, the gun went off.  Do you know where it hit him?

[Appellant]:  No.

[DeVors]:  What, what happened next?

[Appellant]:  He went down.

[DeVors]:  Okay.

[Appellant]:  And I said, ["]Oh, my God, Gregg, what have you done?  What have you done?["]  And I thought — — it was like with Dan,[3] when Dan went down, I went straight and called 911 and said, ["]Please come out here and send, send the ambulance.["]

[DeVors]:  Mm-hmm.

---

[3] Appellant explained early in the interview that Dan was her partner—with whom she had moved to South Carolina—who shot himself within six months of their moving here.

[Appellant]: And I said the same thing this morning. I said, ["]Please send an ambulance. I've just shot someone.["] And I had no idea.

According to Appellant, the Louisiana incident was the basis for the big fight the two had the night before Victim's death. She stated that Victim "couldn't stop beating me over the fact I put him in jail . . . six years ago." Appellant's attorney arrived at the Sheriff's Office and asked for some time with his client, at which time Appellant's interview with Investigator DeVors concluded.

Appellant's second interview was conducted that same day by Investigator Rick Bailey in the presence of Appellant's attorney after her attorney told Investigator Bailey they had more information to share. Appellant expounded on the Louisiana incident and indicated that after Appellant returned from Louisiana toward the end of 2008, she contacted the Kershaw County's victim advocate, told her what happened, and stated she wanted the matter on file. Appellant described Victim as very volatile, and stated it was "like a switch would go off if you said something." Investigator Bailey asked Appellant about what occurred the previous night. She stated Victim wanted money, he got a cab, and she left money in the mailbox—as she had done in the past when Victim would make drunken threats against her and her property if she did not give him money. The next thing she knew, Victim showed up at her house, and she offered him a drink and dinner. She stated that Victim had a drink, and there was an altercation—during which she was thrown on a desk, Victim held her down, and she was "thrashed around."

Investigator Bailey asked Appellant what the situation was that morning up to the point of the shooting. Appellant explained that her mother was supposed to be coming over at 9:00 a.m. to help feed and vaccinate the horses, and Victim asked her about taking him into town. When she told him she needed to call her mother, Victim suggested she "make up some excuse." Appellant decided to drive Victim in the truck over to her mother's while making sure her mother did not see him in order to disguise the fact that Victim had been at her home, as her mother did not want Victim on the property. However, Victim was missing an earring, and he began cussing about it. Appellant suggested the earring was in the bed, and Victim went into the bedroom. Appellant started looking for the earring too but told Victim she needed to "get [him] out of [there]." When she told Victim she would find the earring, he told her, "No, I'm going to find my earring." Appellant continued to press Victim and told him they had to leave "right now." Appellant stated Victim would "do this [thing]" where he would "puff," and he would "swell-up" and "get this glazed look in his eye." She told him, "Come on, I'll get

the damn earring; let's go."  Victim told her, "I'm going to find this earring, and I'm going to fucking kill you."

Appellant stated she had moved the gun from her bedroom over to a bureau where she had a boom box because Victim had previously known where the gun was. She then stated as follows:

> And I came out when he was looking how he was looking and threatening and on and on and on, tearing the bed apart [be]cause he wanted to find a damn earring. And . . . I thought, You know what?  I'm going to get the gun, and I'm going to point it at him . . . which is the first time I've ever done that . . . and I'm going to say, ["]Look, let's go.["]  But I didn't want to get close to him because I was afraid that, if I got close to him, he would take the gun.

Appellant told Investigator Bailey she was standing in the doorway when she pulled the trigger.  She agreed with the investigator when he summarized that she went out of the room because they were arguing and she retrieved the gun from the bureau.  She stated she pointed the gun at him, and Victim "started this," and she said, "[']Monty, look, just let's go. . . .  Come on; let's go.[']  And the way he looked, it looked like he was going to come after me."  When asked if Victim made any advances toward her or said anything while she had the gun pointed at him, she replied, "He said, [']You're not shooting — — like, You're not fucking shooting me.[']  And then he started like this, and I pulled the trigger."  Investigator Bailey then asked, "So he actually lunged at you?"  Appellant replied, "He moved like this to come, but, you know, it's a small space there."  The interview continued:

> [Bailey]:  So you were in the room, and he was getting pretty belligerent and stating what he was going to do, so you went and retrieved the gun, came back into the room. Like I said, it's a short distance.  I mean it's not like you traveled a great distance.  You came into the room and pointed it at him.
>
> [Appellant]:  Mm-hmm.

[Bailey]: And the best you can remember is that he was making comments that you weren't — — you're not going to shoot me and things like that, and he actually moved like — —

[Appellant]: Mm-hmm.

[Bailey]: — — it looked like he was coming towards you. Okay. Like I said, I'm trying to understand, and I apologize if I'm rehashing stuff.

Appellant stated that after the shot went off, she ran because she had no idea what happened. Appellant agreed with Investigator Bailey that she pointed the gun at Victim and he "kind of swelled up again and said, [']You're not going to shoot me[']" and that Victim "kind of leaned forward" toward Appellant, at which point she fired the gun and automatically turned and ran. Appellant said she then dialed 911 and told them "I've shot someone."

When asked "What was the deciding factor in you taking action today," Appellant stated, "I thought that was the end for me." Asked what made her feel that way, she said, "It was all night, all night. And wake up, and, you know, he, he'd want sex." She continued, "This morning it was that way. It was just, I mean, I want sex, and I don't care if you don't want sex." Appellant clarified, however, that she could not say he ever raped her, and it was just rough sex.

Investigator Bailey asked Appellant if she had frustration with Victim about his physical abuse of her the previous night or if she was apprehensive about her mother finding out Victim had spent the night at Appellant's home. Appellant stated that "frustrated" was not the word, and it was more that she was embarrassed that she was with him again and she was demoralized, but she was not "pointing the gun to do that." The investigator asked, if her intent was not to harm Victim, why had she retrieved the gun and pointed it at him. She replied, "I want you out of here. Let's go. Come on. Let's go," explaining Victim "would never take no for an answer." She said she was trying to get Victim out before her mother arrived, and she "just wanted him out of there." Appellant formulated what she was going to tell her mother to delay their meeting and told Victim her plan, but an hour later Victim was still there wanting his back rubbed. She agreed to rub his back, but told him they had to get him out before her mother arrived. Victim got dressed, but then "got pissed" because his earring was missing. Appellant agreed that she was frustrated with how Victim had behaved, and that's when she retrieved the

gun, but her intent was not to harm Victim. Investigator Bailey asked, "I'm assuming your intent was that that was a motivating factor to get him out, was to pull a weapon. What happened that made you pull the trigger?" Appellant replied that "it just happened," and that she was "going to turn and run," but then she thought, "I'm going to have to ditch this gun because he's going to get this gun from me." At this point, her attorney interrupted the next question to discuss Appellant going to the hospital to have her injuries checked. After further discussion on that matter, the interview concluded.

## B. The Immunity Hearing

Appellant filed a Motion for Immunity from Prosecution and a Motion to Dismiss pursuant to the Act. On January 26-27, 2017, Judge Lee held an immunity hearing, during which she clearly stated that the burden was on Appellant to establish her entitlement to immunity by a preponderance of the evidence. Appellant allowed that she was proceeding solely under section 16-11-440(C) of the Act.

Appellant testified she shot Victim the morning of September 11, 2014, because "[he] was going to kill me, and he was going to kill my mother." She testified to the events leading up to the shooting, stating that Victim arrived at her house by taxi at about 10:00 p.m. on September 10, 2014, and he was very agitated when he arrived. She described an altercation that night during which he grabbed her hair and threw her into a door and another when he "thrust" himself at Appellant, "smash[ing her] onto [a] desk." Later in the morning, Victim came into the bedroom and demanded sex. Appellant testified she had a urinary tract infection at the time and she screamed in agony from the sex, "beg[ing] him," but Victim forced himself on her for hours, even though she told Victim "no" to having sex.

Appellant was expecting her mother—who did not approve of Victim—to arrive at 9:00 a.m. to feed the horses and give vaccinations. As Appellant was in the bathroom, Victim told her to hurry up because he was ready to leave; however, she then heard a loud commotion and discovered Victim hit her wind chimes and knocked a plate holding fruits and vegetables to the floor. Appellant asked what was wrong, and Victim said he could not "find his fucking earring." Appellant told him she would find it, but they needed to leave because her mother was about to arrive. Victim replied that he was going to find his earring before he left the house. Appellant again told him she would find it and would let him know once she had. She continued to plead with him to leave before her mother arrived, but Victim kept saying he was going to find the earring. Victim went back into the

bedroom and Appellant followed him. She described Victim as being in a "frenzy over this earring," and stated that as she continued to plead and beg him to go, he "thrust [her] face-first into [a] trunk," causing an indentation in her cheek. Appellant stated that she started to cry because of the pain and, as she tried to get up, Victim kicked her in her back. She testified that she was pulling herself toward the door on her stomach when Victim grabbed her ankle and yanked her back toward him. She kept struggling, and Victim was yelling, "spewing . . . profane words about [her] and [her] mother." Appellant stated she was saying to herself that she was going to die and thinking she needed to protect herself and save herself and she had to "get through this." Appellant had a bureau located one step from the doorway that held a boom box, and behind the boom box was a gun. She "was struggling on [her] belly," and she pulled herself up and retrieved the gun. She stated she was in the doorway crying, and with her back having been kicked and her equilibrium off, she leaned her back on the doorway and pointed the gun. She shot Victim once, and then she ran, grabbed her cell phone, went out the door, and called 911.

Appellant testified that immediately preceding the discharge of the firearm, Victim was screaming profanities and obscenities, which turned into "terrorizing threats of [']I'm going to finish you off, you fucking whore, and I'm going to take your mother out and then I'm going to . . . light this place up.[']" Appellant stated Victim saw her with the gun and said, "[Y]ou wouldn't fucking fire that. You wouldn't fucking shoot it. You wouldn't shoot me." He then moved, and Appellant fired. When asked why she shot Victim, Appellant replied, "He was going to kill me. He was going to kill my mother." Appellant's medical records from her visit to the hospital on September, 11, 2014, were admitted into evidence.[4]

Appellant admitted on cross-examination that she did not tell investigators that she told Victim "no" to having sex. She also acknowledged she did not tell the investigators anything about Victim grabbing her by the hair and thrusting her head into the door the night before the shooting. Additionally, she agreed there was nothing in her statement about Victim kicking her in the back and throwing her into a trunk the morning she shot him. Appellant acknowledged she told investigators she was thinking she would get the gun to point it at Victim and tell

---

[4] The record shows Appellant presented with vertebral tenderness of the mid T spine, as well as bruises on her left forearm and right scapular area. She was also given medication for a urinary tract infection (UTI), and pain medication for soft tissue injuries.

him, "let's go," that she was standing in the doorway and left the room because she and Victim were arguing, she retrieved the gun from the bureau and came back, but she did not say anything about an assault in between any of that. When asked if Victim lunged at her, Appellant stated that he did not.

Dr. Janice Edwards Ross, a forensic pathologist who performed an autopsy on Victim, testified Victim suffered from a single gunshot wound that entered his left mid-back. Based upon her experience, Dr. Ross opined that if Victim was standing straight up, the gun would have had to be positioned below his back and slightly to his left. If "the shooter was in a standing position, shooting straight," Victim would have to have been "bent over slightly such that the bullet would go in the back and then go straight through," but if Victim "stands back up, it looks like it's going upward." Dr. Ross agreed that, at any rate, Victim's back would have been to the shooter. She also opined, based upon the lack of powder or stippling, the gun was two or more feet away from the back of Victim.

Judge Lee issued an order denying Appellant immunity from prosecution. In particular, she determined Appellant was not entitled to immunity under section 16-11-440(C) of the South Carolina Code (2015) because she was not being attacked by Victim or meeting force with force when she shot him. She found the only evidence of Appellant being under attack or meeting force with force was from her own self-serving testimony, and determined Appellant provided conflicting statements on this matter. Judge Lee noted the testimony of the pathologist supported Appellant's statement that Victim was looking for his earring at the time Appellant shot him. She observed that Victim was shot in the back, and the testimony of the pathologist indicated from the trajectory of the bullet that Victim was bent over and facing away from Appellant. Additionally, Judge Lee found "no credible evidence" that it was reasonable for Appellant to believe deadly force was necessary to prevent death or great bodily injury to herself or another or to prevent the commission of a violent crime, again finding the only evidence of such was Appellant's self-serving testimony during the immunity hearing, which was not included in her statements to law enforcement. Judge Lee concluded—based upon Appellant's testimony, her conflicting law enforcement statements, and the forensic evidence presented—Appellant failed to prove by a preponderance of the evidence that it was reasonable for her to believe the use of deadly force was necessary to prevent death or great bodily injury to herself or another or to prevent the commission of a violent crime.

Additionally, Judge Lee determined Appellant was not entitled to immunity under the Act because she could not prove by a preponderance of the evidence the three

elements of self-defense necessary in an immunity matter.[5] First, Judge Lee found Appellant was not without fault in bringing on the difficulty because she brought a loaded weapon into the situation when Victim was not assaulting her, or even facing her, when she retrieved the weapon. Second, she found, other than Appellant's inconsistent and self-serving statements, there was "no credible evidence" Appellant was in actual imminent danger of losing her life or sustaining serious bodily injury at the time of the shooting or that a reasonably prudent person of ordinary firmness and courage would have believed such when she shot Victim. Rather, her statements to law enforcement and her testimony indicated she was motivated to get Victim to leave her house before her mother arrived. Judge Lee also found there was no evidence that any belief of Appellant that she feared being hurt or killed was reasonable since Victim was unarmed, he was shot in the back from a distance of at least two feet, Victim had no defensive wounds, and Appellant gave inconsistent statements about whether Victim even saw her with the gun. Judge Lee concluded there was a question of fact as to whether Appellant was in imminent danger of losing her life or sustaining great bodily injury or whether her belief of such was reasonable, and Appellant could not "prove all of the elements of self-defense (except the duty to retreat) by a preponderance of the evidence."

## C. The Trial

At trial, the State presented evidence that on September 11, 2014, officers responded to Appellant's residence for a shooting incident where they encountered Appellant outside with her mother and found Victim in a small bedroom, unresponsive and with no weapons around him. EMS personnel arrived at the scene and asked Appellant if she had any injuries, but Appellant stated she was fine and refused transport. The coroner also responded to the scene, where he

---

[5] In addressing whether Appellant could prove self-defense, Judge Lee cited *State v. Curry* for the proposition "that when reviewing whether a defendant should be granted immunity under section 16-11-440(C), the trial court 'must necessarily consider the elements of self-defense,'" with the exception of the duty to retreat. 406 S.C. 364, 371, 752 S.E.2d 263, 266 (2013). She then quoted from *Curry* that a "claim of self-defense presents a quintessential jury question, which, most assuredly, is not a situation warranting immunity from prosecution." *Id.* at 372, 752 S.E.2d at 267. However, Judge Lee immediately followed that statement with, "Therefore, this Court must evaluate whether [Appellant] has proven by a preponderance of the evidence that she acted in self-defense when she shot . . . [V]ictim."

found Victim deceased in a back bedroom. Victim was sitting on the floor, face up and propped against a bed.

Dr. Ross, who was qualified as an expert in forensic pathology, again testified on behalf of the State. She noted she found a bullet entrance wound to the left back of Victim's body, and the bullet was found on the right side of Victim's chest underneath his skin. Dr. Ross noted "bullets go straight" and testified, "[T]his bullet went from the back towards the front, from the left towards the right, and slightly upward." She did not find any stippling, which told her the end of the gun was two feet or further away from Victim's back. When asked, based upon her training and experience, what she found in regard to the position of Victim, Dr. Ross stated as follows: "[L]ike I say, bullets go straight. So, it was going left to right, back to front, and slightly upward. Now, if [the shooter] is in a standing position, that might mean that . . . [V]ictim was bent, bent over somewhat. That, that's one scenario." Asked what another scenario might be, Dr. Ross stated, "Well, [Victim] could be lying down on the ground face down, and the shooter could be above him shooting." Dr. Ross found no other significant injuries or defensive wounds on Victim.

On cross-examination, Dr. Ross acknowledged she had said that bullets travel straight and agreed that there were several conceivable scenarios as to how the entrance wound could have occurred. She indicated she would not be able to say whether Victim was moving at the time he was shot. On redirect examination, the solicitor referred to defense counsel's query regarding "different scenarios as far as . . . [V]ictim being shot and could they turn" and then asked whether that changed where the entrance wound was on Victim. Dr. Ross replied that it did not and that "the direction of the wound just mean[t] that the muzzle of the gun was in the back of . . . [V]ictim, slightly to his left," and that the entrance wound was in Victim's back, "[m]oving towards [his] front."

The State also presented the testimony of Victim's friend, Stephanie Owen, who stated that she was supposed to pick Victim up on September 11, 2014, to take him to look for a job. She received two texts from him that morning—around "8:20 something" and "8:30 something"—asking her if she was off work. She texted Victim back about ten minutes later but never received an answer.

SLED Agent Dawn Claycomb stated she and her partner responded to a request by the Kershaw County Sheriff's Office for crime scene assistance on this matter. Agent Claycomb testified concerning the layout of Appellant's home, as well as items found and things she observed at the scene. In particular, she noted she saw

Victim's body in a sitting position leaning against the bed, located approximately ten feet from the bedroom door. Agent Claycomb also testified regarding the location of a cartridge casing found in Appellant's home and possible implications concerning that location.

Investigator DeVors also testified during the trial concerning his involvement with the case, including his interview of Appellant. A redacted version of Investigator DeVors' interview of Appellant was then played for the jury. The investigator testified that although he attempted to get a direct answer from Appellant as to why she pulled the trigger when she shot Victim, he was not able to do so. At the time he interviewed Appellant, he was not aware Victim had been shot in the back. Karen DeVors testified at the trial that she sat in on the interview of Appellant by Investigator DeVors, took photographs of Appellant's injuries, and transported Appellant to the hospital that afternoon due to her injuries.

Investigator Bailey testified at trial that, after arriving at the scene, he was tasked with going back to the office and interviewing Appellant. When he arrived there, Appellant was being interviewed by Investigator DeVors. After Appellant's attorney arrived and spoke with Appellant, Investigator Bailey conducted another interview of Appellant. At that time, Investigator Bailey had information that there had been an argument and Victim had been shot in the back. He also observed at the scene that Victim was in a seated position facing the door. Investigator Bailey's interview of Appellant was played for the jury, after which the solicitor questioned the investigator about the interview. When asked about the portion of the interview regarding why Appellant pulled the trigger when she did, Investigator Bailey expressed his concern with Appellant's answers, explaining Appellant's version of Victim coming at her did not match the bullet entry wound on Victim.

Toni Campbell, a charge nurse working in the emergency department at Kershaw County Medical Center, testified she took a history from Appellant after she arrived at the hospital on September 11, 2014. Appellant told her she had been physically assaulted the night before by a person with whom she had an on again, off again relationship that had been violent in the past; she had been thrown onto a desk, choked, and thrown into a wall; this all occurred between the hours of midnight and 4:30 to 5:00 a.m.; and she had consensual sex that night, but the assailant became angry about his inability to complete the act and began to get aggressive, leading to battery. Appellant complained of pain in the face, neck, and mid-to-upper spine and was found to have soft tissue swelling, but she had no significant injury. She did not complain about a UTI, but a urinalysis performed

based upon her complaint of back pain revealed an incidental finding of a UTI. No rape protocol was performed because Appellant was questioned multiple times and adamantly stated that she was not sexually assaulted and that the sex was consensual. A CAT scan performed on her head, face and neck was unremarkable, except for a questionable nasal fracture. The nurse testified that such a notation could indicate an old injury, soft tissue swelling, or an abnormality in bone structure that could have resulted from a series of assaults to the face.

SLED Agent James Green, who was qualified as an expert in the field of firearms and tool mark identification, testified the bullet recovered from Victim and the cartridge case recovered from the scene were both fired from the pistol found at the scene. When asked by the solicitor about the ejection pattern on this particular firearm, Agent Green replied that it was not an examination performed at SLED due to all of the variables involved. However, he explained, as a general rule, ejection would be to the back and the right for most semi-automatic pistols with an ejector on the left side of the firearm, as was the case with this particular pistol. Nonetheless, he clarified that because this pistol had "a tip-up barrel and the slide [was] open on both sides, [there was] no telling where it [would] go." Agent Green also observed that he had personally shot a firearm like the one involved here, and the cartridges had gone forward, backward, over his left shoulder and over his right shoulder, "[s]o there [was] really no way of telling which way it [would] go once [it was] fired."

Investigator Miles Taylor—the on-call investigator on September 11, 2014, who was assigned this case—testified that he did not initially see the injury to Victim while at the scene but, when the coroner manipulated the body, he observed blood on the back of Victim's shirt. When his shirt was pulled up, there was a wound in Victim's back, but no exit wound was found on his chest. Once he completed his investigation, Investigator Taylor made a decision to charge Appellant after considering the interviews of Appellant conducted by Investigators DeVors and Bailey, the autopsy report, information concerning the trajectory of the bullet, the fact that Appellant stated she was the shooter and the reasons behind it—or the lack thereof. Investigator Taylor testified he was not able to substantiate the statements Appellant made during her interviews based upon the evidence he had. The solicitor asked the investigator if, after reviewing the autopsy report and Appellant's interviews, he had concerns about the information provided. Defense counsel objected to the form of the question as leading, which the trial court overruled. When asked again if he had any concerns about the information Appellant provided to Investigators DeVors and Bailey, he replied that he had concern regarding Victim being shot in the back, noting the information Appellant

was providing was not consistent "as to what she was telling one investigator versus another one about how this occurred." Investigator Taylor further explained his concern was that Appellant told Investigator Bailey that Victim lunged at her, but "the autopsy results [were] totally opposite of what [she was] stating."

## ISSUES

1.      Did the immunity hearing court err in denying Appellant immunity (1) as a matter of law by ruling immunity had to be denied when there was conflicting evidence or (2) by determining Appellant was not entitled to immunity based upon the preponderance of the evidence?

2.      Did the trial court err in admitting improper lay testimony of a Kershaw County Sheriff's Office investigator relaying his difficulty in understanding how Appellant could state that Victim lunged at her when she shot him given that Victim had been shot in the back?

3.      Did the trial court err in admitting impermissible testimony from a SLED agent concerning the possible location of the shooter based upon the location of a cartridge case?

## LAW/ANALYSIS

### A. Immunity from Prosecution

Appellant asserts, because she proved that she was entitled to immunity by a preponderance of the evidence, this court should issue an order granting her immunity outright. In the alternative, she contends she should be granted a new immunity hearing because Judge Lee erred as a matter of law by ruling conflicting evidence mandated immunity be denied. She further asserts she is entitled to a new immunity hearing based upon erroneous determinations made by Judge Lee, including (1) the judge's ruling that Appellant was at fault in bringing on the difficulty because she introduced a loaded weapon into the situation; (2) the judge's incorrect finding of fact that Appellant did not seek protection from Victim by use of the Louisiana order of protection; and (3) the judge's determination that Appellant's testimony regarding her fear of getting hurt was not reasonable since this matter involved domestic violence. We disagree.

As noted, Appellant proceeded solely under section 16-11-440(C) of the Act, which provides as follows:

> A person who is not engaged in an unlawful activity and
> who is attacked in another place where he has a right to
> be, including, but not limited to, his place of business,
> has no duty to retreat and has the right to stand his
> ground and meet force with force, including deadly force,
> *if he reasonably believes it is necessary to prevent death*
> *or great bodily injury to himself or another person or to*
> *prevent the commission of a violent crime . . . .*

S.C. Code Ann. §16-11-440(C) (2015) (emphasis added).

"A claim of immunity under the Act requires a pretrial determination using a preponderance of the evidence standard, which [the appellate] court reviews under an abuse of discretion standard of review." *Curry*, 406 S.C. at 370, 752 S.E.2d at 266. "Consistent with the Castle Doctrine and the text of the Act, a valid case of self-defense must exist, and the trial court must necessarily consider the elements of self-defense in determining a defendant's entitlement to the Act's immunity" which "includes all elements of self-defense, save the duty to retreat." *Id.* at 371, 752 S.E.2d at 266. "[I]mmunity is predicated on an accused demonstrating the elements of self-defense to the satisfaction of the trial court by the preponderance of the evidence." *Id.* at 372, 752 S.E.2d at 267. "Section 16-11-450 provides immunity from prosecution if a person is found to be justified in using deadly force under the Act." *State v. Cervantes-Pavon*, 426 S.C. 442, 449, 827 S.E.2d 564, 567-68 (2019) (quoting *Curry*, 406 S.C. at 371, 752 S.E.2d at 266).

> To warrant immunity, a movant must show he was
> without fault in bringing on the difficulty, he actually
> believed he was in imminent danger of losing his life or
> sustaining serious bodily injury, and a reasonably prudent
> man of ordinary firmness and courage would have
> entertained the same belief.  He may also show that he
> actually was in imminent danger and the circumstances
> would have warranted a man of ordinary firmness and
> courage to strike the fatal blow to save himself from
> serious harm or death.  Section 16-11-440(C) provides
> the movant has no duty to retreat if, at the time of the
> attack, he was in a place where he has a legal right to be.

*Id.* at 449, 827 S.E.2d at 568 (citations omitted). Notably, "just because conflicting evidence as to an immunity issue exists does not automatically require the court to deny immunity; the court must sit as the fact-finder at this hearing, weigh the evidence presented, and reach a conclusion under the Act." *Id.* at 451, 827 S.E.2d at 569.

After review of the evidence presented at the immunity hearing and Judge Lee's order, we find no error in the denial of immunity to Appellant. First, we recognize the immunity hearing court's recitation of the language from *Curry*—that a "claim of self-defense presents a quintessential jury question, which, most assuredly, is not a situation warranting immunity from prosecution"—may lead one to question whether the judge erroneously applied the standard by finding immunity improper when there is conflicting evidence. 406 S.C. at 372, 752 S.E.2d at 267. However, this statement was immediately followed with the judge's recognition that she was tasked with evaluating whether Appellant proved by the preponderance of the evidence that she acted in self-defense when she shot Victim. Further, a review of the order shows Judge Lee recognized she was required to determine whether Appellant could meet her burden of establishing she was entitled to immunity by a preponderance of the evidence, acknowledging the same numerous times throughout the order. A thorough review of the order convinces us Judge Lee applied the appropriate standard and did not rely upon a conflict in the evidence as a basis to automatically deny immunity. Rather, Judge Lee was well aware of, and correctly applied, the proper standard, weighing the evidence and determining Appellant failed to prove she was entitled to immunity based upon the preponderance of that evidence.

As to Appellant's arguments that Judge Lee made erroneous findings and that she successfully proved she was entitled to immunity by a preponderance of evidence, we find there is evidence to support Judge Lee's determination that Appellant was not entitled to immunity under the Act because she could not prove the necessary element (1) that she either actually believed she was in imminent danger of losing her life or sustaining serious bodily injury—and a reasonably prudent man of ordinary firmness and courage would have entertained the same belief, or (2) that she actually was in such imminent danger and the circumstances were such as would warrant a person of ordinary prudence, firmness, and courage to strike the fatal blow in order to save herself from serious bodily harm or losing her life when she shot Victim. *See Cervantes-Pavon*, 426 S.C. at 449, 827 S.E.2d at 568 ("To warrant immunity, a movant must show . . . he actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, and a reasonably prudent man of ordinary firmness and courage would have entertained

the same belief . . . [or] that he actually was in imminent danger and the circumstances would have warranted a man of ordinary firmness and courage to strike the fatal blow to save himself from serious harm or death."); *Curry*, 406 S.C. at 371, 752 S.E.2d at 266 ("Consistent with the Castle Doctrine and the text of the Act, a valid case of self-defense must exist, and the trial court must necessarily consider the elements of self-defense in determining a defendant's entitlement to the Act's immunity.  This includes all elements of self-defense, save the duty to retreat."); *id.* at 372, 752 S.E.2d at 267 ("[I]mmunity is predicated on an accused demonstrating the elements of self-defense to the satisfaction of the trial court by the preponderance of the evidence.").  Specifically, the evidence supports Judge Lee's determination that "other than [Appellant's] inconsistent and self-serving statements, there [wa]s no credible evidence that [Appellant] was in actual imminent danger[,]" or that she reasonably believed that she was in actual imminent danger, "of losing her life or sustaining serious bodily injury at the time of the shooting or that a reasonably prudent person of ordinary firmness and courage would have believed such when she shot [Victim]."  *Cf. Cervantes-Pavon*, 426 S.C. at 452, 827 S.E.2d at 569 (reversing the circuit court's denial of immunity under the Act, in spite of the State's contention there was evidence from the immunity hearing to support the court's ruling, when our supreme court was "unable to discern a legally correct basis on which the court relied").

As noted by Judge Lee, Appellant's statements to law enforcement indicated she was motivated to retrieve the gun and point it at Victim by her desire to get Victim to leave the house before her mother arrived.  Further, Appellant's story changed in significant respects between her statements to law enforcement and her testimony at the immunity hearing.  In her statement to Investigator Bailey, Appellant indicated that Victim moved toward her before she pulled the trigger, and she did not disagree with Investigator Bailey when he characterized her statement to him concerning Victim lunging at or coming toward her before she shot him.  However, at the immunity hearing, Appellant specifically denied that Victim lunged at her. Additionally, in her statements to the investigators, Appellant only discussed a physical assault by Victim the night before.  In the hearing, she testified that when Victim was searching for his earring and she was asking him to leave that morning before the shooting, Victim thrust her face-first into a trunk and, as she tried to get up, he kicked her in her back, grabbed her ankle and yanked her back toward him. Appellant's account also changed inasmuch as she continuously asserted to law enforcement that the sex she engaged in with Victim was consensual, but at the hearing stated she told Victim "no" to having sex.  Notably, although both investigators continually sought information about what caused Appellant to pull the trigger when she did, Appellant never told them that Victim was assaulting her

just before that moment and that she feared for her life, as she testified during the immunity hearing. Rather, she indicated to the investigators that she retrieved the weapon in order to persuade Victim to leave the house and she pulled the trigger when she became fearful that he might take the gun from her and because she was tired of being hurt by him.

Based upon a review of Appellant's statements, her immunity hearing testimony, the forensic evidence submitted at the hearing, and other evidence from the hearing showing Victim was texting someone else to obtain a ride that morning, we find evidence in the record supports Judge Lee's determination that Appellant failed to meet her burden of proof by the preponderance of a evidence. Our deferential standard of review requires us to uphold Judge Lee's factual findings if there is evidence to support the same. *See State v. Manning*, 418 S.C. 38, 45, 791 S.E.2d 148, 151 (2016) ("We review immunity determinations under an abuse of discretion standard.); *id.* ("An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." (quoting *State v. Douglas*, 411 S.C. 307, 316, 768 S.E.2d 232, 237 (Ct. App. 2014)); *Curry*, 406 S.C. at 370, 752 S.E.2d at 266 ("A claim of immunity under the Act requires a pretrial determination using a preponderance of the evidence standard, which [the appellate] court reviews under an abuse of discretion standard of review."); *Douglas*, 411 S.C. at 316, 768 S.E.2d at 238 ("[T]he appellate court 'does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial court's ruling is supported by any evidence.'" (quoting *State v. Mitchell*, 382 S.C. 1, 4, 675 S.E.2d 435, 437 (2009))); *State v. Scott*, 424 S.C. 463, 476, 819 S.E.2d 116, 122 (2018) (Hearn, J., dissenting) (recognizing the appellate court's "limited lens when reviewing a circuit court's factual findings from an immunity hearing under the [Act]"). Accordingly, we hold Judge Lee did not abuse her discretion in denying Appellant immunity from prosecution under the Act.

### B. Investigator Bailey's Testimony

The following colloquy occurred during Investigator Bailey's[6] testimony regarding Appellant's statement to law enforcement concerning why Appellant pulled the trigger when she did:

---

[6] Although Appellant indicates in her brief that she is challenging Investigator DeVors' testimony, it is clear from her argument and the testimony in the record she is actually challenging that of Investigator Bailey.

[Solicitor]:  And you asked her several times why she pulled the trigger?

[Bailey]:  Uh-huh.

. . .

[Solicitor]:  Why did you ask her so many times?

[Bailey]:  I was trying to determine why she pulled the trigger.  What would have made her do that.  Was she in fear or was there something going on, was he coming after her.  I wanted to know why she pulled the trigger.

[Solicitor]:  And did she ever at all tell you that she was in the midst of being assaulted when she shot [sic] the trigger?

[Bailey]:  One thing that concerned me, and I wasn't there to make a determination on guilt or innocence, was she, in the video, I think you may have seen, she said, ["]He kind of came at me like that.["]  The thing that bothered me about that was I had already been told the point of impact of the bullet, and it didn't match up.

[Solicitor]:  What do you mean it didn't match up?

[Bailey]:  I found it hard to believe if he was coming at her - -

[Defense Counsel]:  Objection, Your Honor.  Asking for a conclusion.

[Solicitor]:  I'm asking for his conclusion, not an evidentiary — —

[The Court]:  Tell me what your objection is.

. . . .

[Defense Counsel]: He was about ready to give a conclusion based on what he has heard as to why she may have shot him. We can talk about facts, but now why he's being able to shoot — — or why she, I'm sorry, is being able to shoot. It is a conclusion on his part.

[The Court]: Ask the question one more time.

[Solicitor]: I asked why — — he stated that there was some concern or he kept asking about the trigger. And I asked him why was there a difference . . . . My question was something to the effect of, Why did you — — was there a concern that there was — — what she said about going at him and he was explaining that, why that was a concern to him. That was it.

[The Court]: I'm going to allow the question.

[Solicitor]: You can go ahead.

[Bailey]: I'm sorry. During the interview, I wanted to get as much detail as [to] what happened that led up to the event of actually pulling the trigger. Her response was that he pulled up and he kind of lunged at her. She never said, ["]He came at me,["] but she motioned that he kind of lunged towards her.

Prior to the interview, I had knowledge that the deceased had been — — actually, the point of impact of the bullet was in the back. I had trouble understanding how if he was lunging forward how he was shot in the back.

No further objection was raised to Investigator Bailey's answer, and the solicitor then turned the witness over to the defense, whereupon the following colloquy immediately occurred between Investigator Bailey and defense counsel:

[Defense Counsel]: Is it your contention that he has to be charging at her to shoot him?

[Bailey]: That wasn't my contention. I was — —

[Defense Counsel]: I'm asking you that question. Give us your opinion on that, sir.

[Bailey]: I find it hard to believe that I was told that he was lunging at her, but he was shot in the back. That's where I had the issue.

Appellant asserts the trial court erred in allowing the investigator to "opine he did not understand how [A]ppellant could state that [Victim] lunged at her when she shot him, [when Victim] was shot in the back, since this was improper lay opinion that went beyond the investigator's duties as a fact finder, [when] he was not an expert qualified to give opinion testimony, and it directly attacked [A]ppellant's self-defense case." She argues, pursuant to our rules of evidence, a lay witness is only allowed to testify to matters within his personal knowledge and may not offer opinion testimony that requires special knowledge, skill, experience, or training. Appellant contends that "[d]efense counsel correctly objected that [Investigator] Bailey should not be allowed to give a conclusion or opinion about *how* the shooting occurred" as he was purely a fact witness, not an expert witness. (emphasis added). She maintains Investigator Bailey's testimony that he found it difficult to believe Victim was coming toward Appellant when he was shot in the back went to the heart of her self-defense claim, which was the ultimate issue to be decided by the jury, and amounted to improper opinion testimony.

"A common distinction between expert witnesses and lay witnesses is that most lay witnesses do not state 'opinions.'" *State v. Gibbs*, 431 S.C. 313, 321, 847 S.E.2d 495, 499 (Ct. App. 2020), *cert. granted*, S.C. Sup. Ct. order dated June 18, 2021. "Even so, the evidentiary rules allow a lay witness to offer an opinion if certain criteria are met." *Id.* Our rule of evidence concerning lay testimony provides as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which (a) are rationally based on the perception of the witness, (b) are helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) do not require special knowledge, skill, experience or training.

Rule 701, SCRE.

First, we question whether the issue raised on appeal is properly preserved for our review. A review of Investigator Bailey's testimony in this matter shows the solicitor questioned him regarding his interview of Appellant and any statements she made regarding why she pulled the trigger at the moment she did. The solicitor specifically asked the investigator whether Appellant ever told him that she was in the midst of being assaulted when she pulled the trigger. No objection was made to this question. Investigator Bailey responded that Appellant's statement to him in this regard concerned him because Appellant indicated Victim had come at her and he was aware of the point of impact of the bullet, which did not "match up." The solicitor then asked what the investigator meant by it not matching up, and defense counsel objected when Investigator Bailey began to reply, "I found it hard to believe if he was coming at her — —," on the basis that it was "[a]sking for a conclusion." The trial court sought clarification as to the basis of the objection and defense counsel stated, "He was about ready to give a conclusion based on what he has heard as to *why* she may have shot him. We can talk about facts, but now why he's being able to shoot - - or *why she*, I'm sorry, *is being able to shoot*. It is a conclusion on his part." (emphases added). Thus, defense counsel's objection was that the witness was getting ready to state "why" Appellant shot Victim. On appeal, Appellant asserts error in the trial court permitting Investigator Bailey to give a conclusion or opinion about "how" the shooting occurred—not "why" as argued to the trial court—noting Bailey stated he had trouble understanding how Victim "could have been lunging forward towards [A]ppellant when he was shot in the back." Defense counsel never raised any argument concerning evidentiary Rule 701, the propriety of lay testimony, or the inadmissibility of Investigator Bailey's "opinion" that it was difficult to reconcile Appellant's statement concerning Victim coming at her with the knowledge that Victim had been shot in the back. *See State v. Porter*, 389 S.C. 27, 37, 698 S.E.2d 237, 242 (Ct. App. 2010) ("The general rule of issue preservation is if an issue was not raised to and ruled upon by the trial court, it will not be considered for the first time on appeal."); *id.* at 38, 698 S.E.2d at 242 ("Imposing this preservation requirement is meant to enable the trial court to rule properly after it has considered all the relevant facts, law, and arguments."); *State v. Benton*, 338 S.C. 151, 156-57, 526 S.E.2d 228, 231 (2000) (explaining that an issue is unpreserved if a defendant argues one ground at trial and a different ground on appeal). Based upon the argument made at trial, we simply cannot conclude the contention raised on appeal—that the complained of testimony of Investigator Bailey amounted to improper lay testimony—was clearly presented to the trial court. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ("A party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground.").

However, even assuming defense counsel's objection sufficiently preserved the issue, we disagree with Appellant's assertion that Investigator Bailey's testimony constituted improper lay testimony. The investigator's answer did not offer a conclusion about either why or how Appellant may have shot Victim. Rather, it answered the solicitor's question of why Appellant's interview statements regarding what was occurring at the time she pulled the trigger raised a concern for the investigator. Thus, Investigator Bailey simply conveyed his perception that Appellant was indicating in her statement that Victim was coming toward her when Victim was shot, which caused him concern based upon his knowledge that Victim was shot in the back. This did not require specialized knowledge, skill, experience or training. *See* Rule 701, SCRE ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which (a) are rationally based on the perception of the witness, (b) are helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) do not require special knowledge, skill, experience or training."); *Huffman v. Sunshine Recycling, LLC*, 426 S.C. 262, 281, 826 S.E.2d 609, 619 (2019) (finding the officers' testimony based upon their perceptions of their interactions with an individual complaining of theft "did not require special knowledge, skill, experience, or training [] and did not stray into the realm of expert testimony"); Rule 704, SCRE ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.").

Further, we find any error in the admission of this testimony from Investigator Bailey was harmless, as it was cumulative to other un-objected to testimony. First, immediately after this testimony on direct examination, defense counsel questioned Investigator Bailey as to whether he was contending Victim had to be charging at Appellant in order for her to shoot him. Investigator Bailey indicated that was not his contention, clarifying he found it hard to believe that he was told by Appellant that Victim was lunging at her given the fact that Victim was shot in the back, and he maintained that was "where [he] had the issue." Notably, defense counsel did not raise any objection nor request the answer be stricken from the record. Additionally, the record shows the solicitor asked another law enforcement officer—Investigator Taylor—whether, after reviewing the autopsy report and Appellant's interviews, he had a concern about the information provided by

Appellant.[7]  Investigator Taylor answered in the affirmative, explaining Victim had been shot in the back, the information Appellant provided in her interview was not consistent between the two investigator's interviews, and—as to her interview with Investigator Bailey in particular—Appellant indicated Victim had lunged at her, but "the autopsy results [were] totally opposite of what [she was] saying."  Because Investigator Bailey's direct examination testimony complained of on appeal is cumulative to his cross-examination testimony, as well as to Investigator Taylor's testimony, Appellant cannot show prejudice from the admission of Investigator Bailey's testimony in this regard, and any possible error is harmless.  *See State v. Brewer*, 411 S.C. 401, 409, 768 S.E.2d 656, 660 (2015) ("The admission of improper evidence is harmless [when] it is merely cumulative to other evidence." (quoting *State v. Johnson*, 298 S.C. 496, 499, 381 S.E.2d 732, 733 (1989))); *State v. Taylor*, 333 S.C. 159, 172, 508 S.E.2d 870, 876 (1998) ("[I]n order for [an appellate court] to reverse a case based on the erroneous admission or exclusion of evidence, prejudice must be shown."); *State v. Byers*, 392 S.C. 438, 448, 710 S.E.2d 55, 60 (2011) ("Error is harmless when it could not reasonably have affected the result of the trial." (quoting *State v. Reeves*, 301 S.C. 191, 194, 391 S.E.2d 241, 243 (1990))).

### C. Agent Claycomb's Testimony

Agent Claycomb testified concerning the layout of Appellant's home and her observations of the scene, specifically noting a cartridge case was located in a laundry basket sitting on top of a trunk that was near the door in the bedroom.  The agent stated that she did not find anything that would indicate "where the shooter was."  When asked about the cartridge case in particular, she stated, "[W]e can't necessarily tell where the shooter was located" as the gun may have a right or left ejection, and the location of the cartridge case would not "necessarily give us the exact location of the shooter."  However, Agent Claycomb then testified, "It could allow you to eliminate areas that the shooter may have been or give you an idea of a location the shooter may have been."  The following colloquy thereafter occurred:

> [Solicitor]:  In this case, the [cartridge case] was found right by the doorway, I believe you said?

---

[7] Defense counsel did object to this question, but only on the basis that it was a leading question.  The trial court overruled that objection, and Appellant does not challenge this ruling on appeal.

[Claycomb]:  Correct.  Right when you walk in the bedroom door, there was  — — the first small chest in a laundry basket.

[Solicitor]:  So what did that eliminate for you as to where the shooting would have occurred?

[Agent Claycomb]:  Well, saying — —

[Defense Counsel]:  Your Honor, I object to the fact — — I believe it's outside the scope of her — — I believe they have an expert coming in to talk about that.  I believe this would be outside the scope of — — if we're talking about trajectory and — —

[Solicitor]:  I'm not.  I didn't ask trajectory.  I literally asked what places did it eliminate the shooting could have come from.

[Defense Counsel]:  But that would be based on the trajectory.

[Solicitor]:  Well, if I can lead her, then I can ask the specific question.

[Defense Counsel]:  No, Your honor.  The rules don't allow it.

[The Court]:  Just limit it to the [cartridge case].  I'm going to allow the question.

[Solicitor]:  What areas did it eliminate that the shooting could have happened at?

[Agent Claycomb]:  Within the bedroom, saying that if the cartridge case was not moved or tampered with at that point.

[Solicitor]:  And all I meant was, in other words, it didn't happen in the living room?

[Agent Claycomb]:  Correct.  If you would find the cartridge case in the bedroom, yeah, it would not occur in the living room had it not been touched or moved, anything like that.

Appellant contends the trial court erred in allowing Agent Claycomb to testify that she eliminated the shooting from happening "within the bedroom" or "in the living room" since the agent was not an expert and her impermissible lay testimony was highly prejudicial, as it was intended to convey to the jury that the shooting did not occur as Appellant told law enforcement.  Conceding that this testimony by Agent Claycomb was "very confusing," Appellant maintains the motive for the question and answer was clearly to show the shooting—as deduced from the agent's view of the forensic evidence—did not match Appellant's version.

After a thorough review of the record, we find any error in the admission of Agent Claycomb's testimony in this regard was harmless.  First, the testimony elicited from the agent in this matter was confusing and somewhat contradictory.  Agent Claycomb undermined her own statement that she did not find anything that would indicate where the shooter was and she could not "necessarily tell where the shooter was located" by testifying she could eliminate areas where the shooting occurred.  Then, when she was allowed to answer the solicitor's question concerning what areas could be eliminated from where the shooting occurred, it appears she misunderstood the question and stated "within the bedroom."  It appears Agent Claycomb may have thought the question asked was what areas were *not* eliminated by the location of the cartridge casing and the solicitor—recognizing the confusion over the question—attempted to clarify the matter by asking, "And all I meant was, in other words, it didn't happen in the living room?"  On this point, Agent Claycomb agreed with the solicitor, assuming the cartridge case had not been moved.

Further, the testimony of Agent Claycomb concerning any significance of the location of the fired cartridge casing was refuted by the testimony of SLED Agent Green, a forensic firearm examiner who was qualified as an expert in the fields of firearms and tool mark identification.  Agent Green testified that SLED did not perform ejection pattern tests for cartridges, noting all the variables involved that could not be replicated.  He then stated, based on the specific characteristics of the firearm used to shoot Victim, there was no way to tell where the ejected cartridge case would go.  Thus, Agent Green's expert testimony effectively refuted Agent Claycomb's lay testimony regarding the significance of the location of the cartridge

in regard to the location of the shooter. Finally, we agree with the State that the testimony complained of on appeal was insignificant and irrelevant to any critical issue in dispute. Given the confusing and conflicting nature of Agent Claycomb's testimony, we disagree with Appellant's assertion that it conveyed to the jury that the shooting did not occur as Appellant told law enforcement. The only evidence submitted at the trial concerning where Appellant was specifically located when she shot Victim was in Appellant's statement to law enforcement. Appellant told Investigator Bailey that she stood in the doorway of the bedroom when she pulled the trigger. Other than the confusing testimony of Agent Claycomb inexplicably indicating the shooting would have been eliminated from occurring "[w]ithin the bedroom,"—which is likely attributed to a misunderstanding of the question—there is nothing in the record to suggest the State disputed where Appellant was standing when she shot Victim. Rather, the only evidence presented by the State concerning the location of the shooter as related to Victim at the time of the shooting was Appellant's statement to Investigator Bailey that she was in the doorway when she shot Victim, Agent Claycomb's testimony that Victim was located approximately ten feet from the bedroom door, and the pathologist's testimony that the gun used to shoot Victim was a distance of at least two feet away from Victim when he was shot. In short, in view of the confusing and contradictory nature of Agent Claycomb's testimony and the fact that it was corrected by Agent Green, we do not believe Agent Claycomb's testimony in this regard suggested to the jury that the shooting did not occur in the location Appellant had conveyed to law enforcement. Further, because the location of the shooter was not in issue, we fail to see how Agent Claycomb's testimony in this regard prejudiced Appellant. *See Taylor*, 333 S.C. at 172, 508 S.E.2d at 876 ("[I]n order for [an appellate court] to reverse a case based on the erroneous admission or exclusion of evidence, prejudice must be shown."); *State v. Reyes*, 432 S.C. 394, 405-06, 853 S.E.2d 334, 340 (2020) ("Some errors—when considered in the context of the facts of a particular case—are so insignificant and inconsequential they do not require reversal of a conviction."); *id.* at 406, 853 S.E.2d at 340 ("Whether an error is harmless depends on the circumstances of the particular case. No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it 'could not reasonably have affected the result of the trial.'" (quoting *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985))); *State v. Price*, 368 S.C. 494, 499, 629 S.E.2d 363, 366 (2006) ("[When] a review of the entire record establishes the error is harmless beyond a reasonable doubt, the conviction should not be reversed.").

**CONCLUSION**

For the foregoing reasons, Appellant's conviction is affirmed.

**AFFIRMED.**

**LOCKEMY, C.J., and MCDONALD, J., concur.**